GLIDDEN RURAL ELECTRIC CO-OPERATIVE, Appellant, v. IOWA EMPLOYMENT SECURITY COMMISSION, Appellee.

No. 46680.

NOVEMBER 13, 1945.

George A. Rice, of Mapleton, E. A. Raun, of Denison, and Wisdom & Wisdom, of Des Moines, for appellant.

F. D. Riley, of Des Moines, for appellee.

MANTZ, J.— The action is in equity by the Glidden Rural Electric Cooperative, as plaintiff, against the Iowa Employment Security Commission, as defendant, to cancel assessments of unemployment-compensation tax levied against plaintiff by defendant for the years 1937, 1938, 1939, and 1940.

The trial court denied plaintiff's claim, dismissed its petition, and this appeal followed.

I. The action being in equity is triable here de novo. There are no disputed facts. Appellant is a co-operative corporation organized under chapter 390.1, Code of Iowa, 1939, relating to co-operative associations organized after July 4, 1933. Its principal place of business is in Carroll, Iowa, and

its transmission lines extend into several adjoining counties. Its objects and purposes are as set forth in Article IV, subsection 1, of its articles of incorporation, and are as follows:

"[A] To generate, manufacture, purchase, acquire and accumulate electric energy for its members and to transmit, distribute, furnish, sell and dispose of such electric energy to its members; and [B] to construct, erect, purchase, lease as lessee, and in any manner acquire, own, hold, maintain, operate, sell, dispose of, lease as lessor, exchange and mortgage plants, buildings, works, machinery, supplies, apparatus, equipment and transmission and distribution lines or systems necessary, convenient or useful for carrying out and accomplishing any of the foregoing purposes * * * ."

Appellant does not produce or generate electric power but has at all times purchased such product from the municipal plant of Glidden, Iowa, and distributed it to the members. It had about 428 miles of transmission line and about 940 members when the case was tried. When it was organized and received its permit on August 26, 1936, it had no physical property such as plant, transmission lines, or service connections. Not having the proper and necessary equipment to build transmission lines, it let contracts for their construction. Such lines were built under certain specifications and when built and accepted became a part of its co-operative system. Contracts were entered into for such line construction with the Hoak Construction Company as follows: In 1936, 55 miles; in 1938, 90 miles; in 1939, 124 miles. One contract was let to the Evans Construction Company in 1939 for 90 to 110 miles. All of these contracts were carried out; the transmission lines were built and accepted and are now a part of appellant's system. Service connections for the individual members were made as the transmission lines were being built. Following the building of the transmission lines all service connections for new members were made by the appellant. In all, appellant made about fifty to sixty of such service connections.

The Hoak Construction Company and the Evans Construction Company were in the business of constructing electric transmission and distribution lines during the rural electri-

fication program. The former constructed such lines in Calhoun county, Crawford county, Cherokee county, Guthrie county, and Greene county. The latter, during the same period, constructed similar lines in Plymouth county, Cherokee county, and Pocahontas county.

At the time the contracts were being carried out on the transmission lines for appellant the principal contractors paid for their various employees to the state of Iowa the state unemployment compensation. Later appellee decided that at the time the transmission lines were being built for appellant the employees of the contracting companies were to be counted as employees of appellant, thereby making the latter liable for the tax upon its other employees. This action on the part of the appellee is the basis of this action.

Appellant never had working for it at any one time eight employees and it was only by adding to the number of its employees those employed by either the Hoak Construction Company or the Evans Construction Company in building the transmission lines that the tax was made possible. The appellee concedes that in case the employees of the two contractors of the various transmission lines cannot be added to the regular employees of appellant, then there is no tax payable. It will thus be seen that one of the issues herein is whether or not the employees of the Hoak Construction Company or the Evans Construction Company in building the transmission lines must be deemed employees of appellant within the provisions of chapter 77.2 of the 1939 Code. The assessment in the instant case is by reason of the provisions of section 1551.25, subsection E, of said chapter, the material portion of which, so far as this appeal is concerned, provides as follows:

"Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of subsection 'F' or section 1551.14, subsection 'C', the employing unit shall for all the purposes of this chapter be deemed to employ each

individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such work.''

In its decree the trial court said:

''The only question for determination, therefore, is whether the work done by the contractors who built all of the plaintiff's primary lines and the greater part of its secondary lines was a part of the plaintiff's 'usual trade, occupation, profession, or business' within the contemplation of the above quoted statute [section 1551.25(E), Code of 1939].

''The court finds that the business of the cooperative as expressed in its articles is to accomplish its corporate purpose of generating or acquiring electricity and providing transmission lines, primary and secondary, for distribution to its members; that plaintiff's transmission and distribution lines are the very instrumentalities by which, and by which alone, plaintiff does, or can, either receive or deliver the electricity; that the work of constructing such lines is an actual, integral and operative part of the business of transmitting and distributing electricity—the very process and part of that business, and that the construction of the transmission lines and the distribution system by independent contractors was a part of the usual business of the plaintiff Glidden Rural Electric Cooperative.''

Thereafter the court denied the petition of appellant and confirmed the tax imposed by appellee.

II. Was the work done by the contracting firms in building the various units of the transmission lines for appellant a part of appellant's ''usual trade, occupation, profession, or business'' within the meaning of section 1551.25(E), Code of Iowa, 1939? We think this to be the decisive question in this case. The trial court answered this question in the affirmative, thus holding that such workmen were employees of appellant and that the work performed by them was a part of the usual business of appellant.

Following a careful study of the record, the statutes, and the authorities, we are of the opinion that the trial court erred in so holding.

Appellant at no time built any primary transmission lines and had no equipment for that purpose. All such lines used by it were built by independent contractors. The only lines built by the appellant were of a secondary nature, connecting customers with its primary lines after they had been built.

Both parties are in agreement that the "usual" business of appellant is that of the transmission of electricity. Concerning this the trial court held that, inasmuch as the usual business of appellant was the transmission and distribution of electricity, in order to do so it had to have transmission lines; that such transmission lines were instrumentalities for doing so; and therefore, the work of constructing such lines was "an actual, integral and operative part of the business of transmitting and distributing electricity." It will be seen that the trial court held that the building and installing of all things necessary to carry on the business of appellant were necessarily a part of its usual business. This would seem to narrow the issue, as applied to the statute above referred to, that the building of the transmission lines was a part of the usual business of appellant.

Appellant and appellee are unable to agree as to the meaning of the word "usual" in the statute. The appellant argues that in connection with the statute the word "usual" means the same as the word "regular" and is to be taken in its ordinary everyday meaning and that the usual business of appellant is to distribute electricity. On the other hand, appellee argues that the word "usual" as used by the legislature was in the sense of "essential to" or a "necessary part of" the business or for the "purpose" of such business, and that as in this case the transmission lines were essential to the distribution of electricity their building was a part of the "usual business" of appellant. We think that appellant's view as to the particular statute under construction is correct.

III. In the construction of statutes, words are to be given their ordinary meaning unless the context shows a contrary intent on the part of the legislature. Section 63(2), Code of 1939; Des Moines City Ry. v. City of Des Moines, 205 Iowa

495, 216 N. W. 284; State ex rel. Ingram v. Larson, 224 Iowa 509, 275 N. W. 566; State v. Carson, 147 Iowa 561, 126 N. W. 698, 140 Am. St. Rep. 330; Model Laundry Co. v. Barnett, 180 Iowa 55, 162 N. W. 830.

We do not find that this court has expressly construed the word "usual" when used in connection with the section under consideration. However, we have discussed the term in connection with the Workmen's Compensation Act, Code, 1939, section 1361 et seq., in Garrison v. Gortler, 234 Iowa 541, 13 N. W. 2d 358. We will later have some comment on this holding.

Below we set out authorities from opinions and other sources as to the meaning given to the term "usual."

"Usual" means "accustomed; ordinary." Ballentine's Law Dict. 1323.

"Usual" means "customary; ordinary; habitual; common." Webster's New International Dict., Second Ed., 2807.

"Usual" means such as is in common use; such as occurs in ordinary practice, or in the ordinary course of events; customary; ordinary; habitual. "Usual" is synonymous with custom, common, wonted, ordinary, regular. Dancy v. Abraham Bros. Packing Co., 171 Tenn. 311, 102 S. W. 2d 526, 528; Roberts Coal Co. v. Corder Coal Co., 143 Va. 133, 129 S. E. 341; Chicago & A. R. Co. v. House, 172 Ill. 601, 50 N. E. 151; Swisher v. Illinois Cent. R. Co., 182 Ill. 533, 55 N. E. 555.

In Oilmen's Reciprocal Assn. v. Gilleland, Tex. Com. App., 291 S. W. 197, the Texas court, in a workmen's-compensation case, defined the term "usual" when used in connection with the term "usual business," as meaning such as was in common use or occurring in ordinary practice or course of events; customary; ordinary; habitual; common; wonted; regular. Morse v. New Amsterdam Cas. Co., D. C., Tex., 30 F. 2d 974, affirmed, 5 Cir., Tex., 37 F. 2d 100; Wolfe v. Bryant, 181 Tenn. 357, 181 S. W. 2d 343. See, also, St. Louis Southwestern Ry. Co. v. Morrow, Tex. Civ. App., 93 S. W. 162. In 66 C. J. 119, it is stated that the word "usual" means the same as ordinary.

The Texas court, in the case of Texas Employers' Ins. Assn. v. Wright, 128 Tex. 242, 244, 97 S. W. 2d 171, 172, in

upholding a denial of compensation, stated that the case was ruled by the holding in Oilmen's Reciprocal Assn. v. Gilleland. supra. In discussing, under the compensation statute, Vernon's Texas Stats., art. 8306 et seq., the terms "employee" and the "usual course of trade, business, profession or occupation of the employer," the court said:

"The usual trade or business of Diamond Mill and Elevator Company was, according to the undisputed evidence, the milling of grain and the selling of flour and feed, not the construction of buildings. Defendant in error's original employment as sweeper in the mill was in the usual course of such business, but it is the character of the work being done at the time of the injury and not the contract of employment that determines whether the employee is engaged in the usual course of the business. Wells v. Lumbermen's Reciprocal Association (Com. App.), 6 S. W. 2d 346; Fidelity Union Casualty Co. v. Carey (Com. App.), 55 S. W. 2d 795. Defendant in error at the time of his injury was working for the mill and elevator company and in accordance with its direction, but he was not engaged in the performance of work in the usual course of the trade or business of the company. He therefore was not an employee within the statutory definition and is not entitled to compensation under the statute. To hold otherwise would be to ignore and give no effect to the word 'usual' contained in the definition."

The case of Lackey v. Industrial Comm., 80 Colo. 112, 114, 249 P. 662, 663, was an action to recover compensation under the Colorado statute wherein the term as applied to the employee excluded such where such employment is "not in the usual course of trade, business, profession, or occupation of his employer." Laws 1923, 751, section 9(b). Claimant was injured while helping pull down a building upon which a filling station was being erected. The award of the commissioner was overruled. The court said:

"We do not think that the erection of a building can be said to be within the usual course of a business to be carried on in that building unless, perhaps, such business be the busi-

ness of building and the structure be erected in the course of that business. Suppose a building contractor resolves to go into the hotel business, and for that purpose erects the hotel himself. The erection of that hotel may be in the usual course of his business as building contractor but how can it be said that it is in the usual course of his business as a hotel keeper? He is an innkeeper when he opens his house for guests, not before. He is a filling station keeper when he opens his place to fill, not before. Illustrations and analogies might be multiplied without end. We must say that neither the preparation for the erection of a building for the filling station nor the erection of it was within the usual course of business of farming or keeping a filling station.''

In Ostlie v. Dirks & Son, 189 Minn. 34, 36, 248 N. W. 283, 284, it was held that an electrician installing wiring in a building rented by an employer, when injured was not engaged ''in the usual course of business of the employer.'' The claim was made under the workmen's-compensation statute. In its opinion the court said:

''A person may, of course, be engaged in more than one business. The renting of this one apartment, however, cannot properly be classified as a business or occupation in and of itself. The word 'business' as used in 1 Mason Minn. St. 1927, §4268, was defined in State ex rel. Lennon v. District Court, 138 Minn. 103, 106, 164 N. W. 366, 368, as referring 'to the employer's ordinary vocation, and not to every occasional, incidental, or insignificant work he may have to do.' See Billmayer v. Sanford, 177 Minn. 465, 225 N. W. 426; Sink v. Pharaoh, 170 Minn. 137, 212 N. W. 192, 50 A. L. R. 1173.

''To hold otherwise than we have here would result in awarding compensation to an injured employe hired to do work, no matter how remote that work may be from the usual business of the employer. Such a holding would be contrary not only to the letter but to the purpose and intent of the statute. Upon the facts the employment here in question was not covered by the workmen's compensation act [Minn. St. 1927, §4261 et seq. as amended] and the award must be set aside. So ordered.''

In Gaines v. Traders & General Ins. Co., Tex. Civ. App., 99 S. W. 2d 984, 988, there was a claim for compensation because of an injury to a carpenter hired on a per diem basis by a wholesale meat dealer in constructing a cold-storage room in a new building being built for the meat dealer. The compensation act of the state excluded, among others, "one whose employment is not in the usual course of trade, business, profession or occupation of his employer." In confirming a denial of compensation, the Texas court said:

"We think it is plain, under repeated decisions construing said statute, that appellant's injury did not occur while engaged as an employee in the usual course of the business of his employer. The *usual* business of a wholesale meat dealer does not include the construction of new buildings. Practically this identical question was decided by Judge Powell in Oilmen's Reciprocal Ass'n. v. Gilleland, (Tex. Com. App.) 291 S. W. 197, 201; see. also, Croswell v. Commercial Standard Ins. Co. (Tex. Civ. App.), 58 S. W. 2d 918, 921)."

Both parties to this appeal have cited the rather recent case of Garrison v. Gortler, supra. This was a claim under the Workmen's Compensation Act. The claimant was repairing a roof of a retail grocery and meat business. While he was carrying a heavy roll of roofing material to repair the roof, the ladder broke; claimant fell on a cement walk and was injured. The claim was resisted principally on the ground that claimant was an independent contractor, that his employment was casual and was not for the employer's trade or business. This court held that claimant was in the employment of the owner when injured and was doing work for the purpose of the latter's trade or business. The writer of the opinion, Bliss, J., dealt at length with the history of the compensation act and the statutes of Iowa having application. In discussing the term "for the purpose of the appellee's [owner] trade or business," he stated, at page 544 of 234 Iowa, page 359 of 13 N. W. 2d:

"The application of the exception clause found in all definitions of the word 'employee,' * * * has troubled the courts of this country and of England since their enactment."

In the Garrison case attention was called to various compensation acts and the difference of interpretation to be had in statutes wherein the word "usual" was used in connection with a business and those where the term was not used, holding that the use of the term "usual" was restrictive. We quote from page 547 of 234 Iowa, page 360 of 13 N. W. 2d:

"It is clearly apparent that the language 'for the purpose of the trade or business' is much broader and more inclusive than the words 'within the usual or regular course of the trade or business.' The first expression includes everything that the latter includes * * * Work done in the 'usual course' necessarily would be work done 'for the purpose' of the business, but work done 'for the purpose' of the business might very well not be 'within the usual course' of the business * * * ."

The appellee has cited cases supporting its construction placed upon the term "usual," almost all of which are from other jurisdictions. We have examined these cases and find language in some of them which on its face tends to such support. Some of such seem to arise by reason of the differences in statutes and the rules of statutory construction; some, because of the fact situation. Appellee admits that in the cases conflicts exist: that some of the holdings cannot be reconciled.

Appellee cites several cases from Iowa but seems to rely mainly upon the language of the court in the case of Gardner v. Trustees M. E. Church, 217 Iowa 1390, 250 N. W. 740. Without going into an analysis of the cited case, we call attention to the fact that the language of the court relied upon has been declared to be dictum in our latest holding, Garrison v. Gortler, supra. The court itself in the Gardner case said as much in its opinion.

To accept appellee's view of this matter we would have to hold that the term "usual business" of appellant meant all things done by appellant in the preparation for and distribution of its product—electricity. We are unwilling to so construe the statute.

The record is undisputed that the *usual* business of appellant was the distribution of electricity *after* its primary line

had been constructed by independent contractors. As applied to appellant, such construction work was *uniformly* delegated to others. Such business was that of independent contractors alone. It was *not* a part of appellant's accustomed, customary, habitual, common, wonted, regular business in ordinary practice, or in the ordinary course of events. Accordingly, the workmen engaged by the independent contractors in such construction work are not deemed to be employees of appellant under the provisions of subsection E of section 1551.25, Code of 1939. The trial court erred in so holding.

Various other matters have been set forth and argued in this appeal. All have been considered. However, in view of our finding as above set forth we find it unnecessary to pass thereon.

The judgment must be and it is reversed and the cause is remanded for the entry of a decree in harmony with this opinion.—Reversed and remanded.

MILLER, C. J., and SMITH, HALE, and WENNERSTRUM, JJ., concur.

MULRONEY, BLISS, GARFIELD, and OLIVER, JJ., dissent.

MULRONEY, J. (dissenting)—I respectfully dissent.

The conclusion of the majority is that construction of a primary line, construction of any extension of an existing primary line, or construction of secondary drop lines to customers is no part of the usual or ordinary business of an electric transmission company. With that conclusion I cannot agree and I venture the prediction that the majority opinion will be greeted with some amazement by electric transmission companies who now have employees doing such work.

The sole issue to be decided is whether line construction is a part of plaintiff's usual business. If it is, then the parties agree and it is the law (section 1551.25(E), Code of 1939) that line-construction workmen are to be counted with plaintiff's other employees to determine whether plaintiff is an employing unit under the act, even though the line-construction workmen are actually employees of an independent contractor. If line construction is no part of plaintiff's usual business,

then all agree the construction workmen should not be so counted and, under the facts here, plaintiff would not be an employing unit under the act.

The majority decides the issue by pointing out that "such construction work was *uniformly* delegated to others" and "was that of independent contractors alone" and the majority conclude from this:

"Accordingly, the workmen engaged by the independent contractors in such construction work are not deemed to be employees of appellant under the provisions of subsection E of section 1551.25, Code of 1939."

A single reading of the statute should demonstrate the unsoundness of a decision resting on such a premise. The statute comes into operation only if the company performs a part of its usual business by means of independent contractors. If its use of independent contractors to perform some work is to be construed as establishing that that work is not a part of the company's usual business, then the statute could never operate. The legislature sought to reach, in the tax base of an employer, the use of independent contractors if the work they performed was part of the usual business of the employer. The majority decides the work performed was not a part of the usual business of the employer because performed by independent contractors. By such circuitous reasoning the majority effectively nullify the statute entirely. Surely the question to be decided, namely, whether the construction of the lines was a part of the company's usual business, is one that must be approached without regard to whether the plaintiff built them with its own employees or had them built by independent contractors. If it built them with its own employees, it would be liable for the tax upon all employees under other provisions of the act. If it built them by independent contractors who pay the tax on their workmen, it would be liable for the tax on its own employees under the law if the building of the lines was a part of its usual business. The unemployment-compensation act places a burden of tax liability on employing units who have eight or more individuals performing services for it

during a certain portion of a year. It gives to such workmen the benefits of unemployment compensation. The purpose of section 1551.25(E) is perfectly clear. The legislature knew that there was another way for a company to perform many parts of its usual business besides the employee method. The company could engage independent contractors and accomplish what it had formerly accomplished by employees and in many cases avoid the tax and deprive workmen who did part of its usual business from the benefits of the compensation. It was to avoid such a practice that section 1551.25(E) was enacted. By this section it only carried out the general plan of the legislation, which is to reach with tax burden the company that has eight or more individuals performing any part of its usual or ordinary business and to grant compensation benefits to such workmen without regard to whether the workmen or any number of them are employees of independent contractors with the company. The only effect if there is an independent contract is to relieve the company of the tax burden if the contractor is also an employing unit under the act.

II. There is nothing ambiguous in the statute. The decision here turns on the application of the phrase "part of its usual * * * business" to the facts of this case. Was the construction of the lines a part of plaintiff's usual business? What was plaintiff's usual business? Both sides admit it was the transmission and distribution of electricity to its members. It is admitted by both that plaintiff had the lines constructed by independent contractors in order to enable it to carry out its "usual business" of transmitting and distributing electricity to its members. Now, was the construction of the lines a "part"—any "part"—of that business? It seems clear that the building of the lines over which the electricity was to flow was a part of the usual and ordinary business. Note that the statute does not say that the work must be a usual part of the business. It must be a part of the usual business. Surely the erection of any part of a distribution system that reaches member consumers is a part of the usual or ordinary business of a company engaged in distribution. It may not be a usual part in the sense that it is done daily or frequently, but it seems clear that whenever it is done, to reach the first customer or

the hundreds who later become customers, a part of the company's usual business has been performed. How is the company going to carry out its usual business of distributing electricity? It has to secure electric energy and secure a distribution system that reaches consumers. In other words, a part of the usual business of distributing electricity to customers is securing the manufactured energy to distribute and another part is securing a distribution system over which it is to travel to customers. The customer list may change. New customers may be secured. In order to reach the new customers the company may have to extend its primary lines. It may have to build new drop lines. Is the company whose usual business is the distribution of electric energy to customers performing wholly unusual business by building such primary lines or such drop lines? The electric transmission companies of Iowa which have expanded to meet the needs of growing cities by extending their primary lines and by erecting new drop lines in order to distribute energy to new customers have certainly been engaged in their usual business by such line construction.

While not conclusive, probably the best single test to apply to determine whether the performance of certain work is or is not a part of one's usual business is to consider whether the work performed is usually associated with such business: whether the performers of such work are in an employment that is usually identified with such business. The work done here was line construction of primary and service lines. In other words, the men who performed the work, even though they worked for construction companies, were line-construction men. The company was an electric transmission company. Where are workmen who construct primary line extension and service lines to customers usually found? They are usually employees of electric transmission companies and that very fact is strong evidence that they are carrying out a part of the companies' usual business. Line construction workmen would not usually be employed by electric transmission companies to perform a part of such companies' unusual business.

The record here shows that this company had line-construction employees. Mr. Connor, the superintendent of the

company, testified that where a farmer asked for service after the primary transmission line had been constructed and there was no secondary line to his place, "the Cooperative put on the line at its own expense and by its own *employees*." (Italics supplied.) And with regard to this practice of building such secondary lines, he stated, "That is the usual business of the Cooperative to maintain service." The evidence before the commission showed the company built a new secondary line on an average of every 1.3 to 1.4 months. Mr. Connor further testified that he did not know of anything in the company's articles that would prevent the company from constructing a main or primary line. He said it would not be feasible in the sense that it would not be efficient operation, but if they did do it, it would be a part of the work which their articles authorized.

The foregoing testimony constitutes a complete answer to the only question in the case. The sole inquiry here is whether line construction is a part of the company's usual business. The superintendent has answered in the affirmative in the very language of the statute, stating that they have line-construction employees who build new secondary lines on an average of about every one and a third months as a part of the company's "usual business." In other words, the company had employees who did part of the same work that the construction company employees did and it is admitted that such work was a part of the company's "usual business."

A case which touched on the problem is Singer Sewing Machine Co. v. New Jersey U. Comp. Comm., 128 N. J. Law 611, 615, 27 A. 2d 889, 893, affirmed 130 N. J. Law 173, 31 A. 2d 818. Here the Singer Sewing Machine Company's usual business was the manufacture of machines. It entered into an independent contract with Di Perna, who contracted to act as a distributor to sell the company's products. Di Perna hired a salesman and the question was whether this salesman was entitled to unemployment benefits. The statute was identical with ours, so the question turned on whether he was to be counted as an employee of the company. The court held that under the statute Di Perna's salesman was to be deemed a company employee, stating:

"The employment here contracted for [Di Perna's contract] was indubitably a part of prosecutor's [company's] usual trade or business in the legislative sense. It was primarily a contract for a selling service—such as patently takes the classification of an employment identified with prosecutor's business. The Company manufactured sewing machines, vacuum cleaners, motors and tables, and the individual parts thereof; and it was essential that there be a consumer outlet. Thus the distributor's function was an integral part of the business."

III. Counsel for appellant argue that the Unemployment Compensation Law is a taxing statute and therefore it should be strictly construed in favor of the taxpayer. I think that under any rule of construction, giving the words of the statute their plain ordinary meaning, the tax would apply in this case. While the majority does not mention any rules of construction that should govern the interpretation of section 1551.25(E), Code of 1939, it is obvious that the majority is applying the strict-construction rule. In dissenting from the conclusion of the majority I wish to express my disapproval of the rule of strict construction for this act.

The second section of the act, section 1551.08 gives to the administrators of the act, and to the courts, a guide for interpretation.* A reading of this guide would seem to be direction to give the act a liberal interpretation.

The rule of strict construction was announced by this court in the case of Moorman v. Unemployment Comp. Comm., 230 Iowa 123, 129, 296 N. W. 791, 794, decided March 18, 1941.

*1551.08 **Guide for interpretation.** As a guide to the interpretation and application of this chapter, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

In that case this court undertook "to set a guide of interpretation" for this particular statute which seems to be at variance with the legislative guide.

· The opinion points out that the legislation "is remedial in character and that its enactment was to make possible the avoidance of involuntary unemployment and to distribute the cost of involuntary unemployment among the employers of industry who employed workers for wage." The opinion then states that this court and other courts have held remedial legislation should receive a broad and liberal construction and the opinion quotes from Rish v. Iowa Portland Cement Co., 186 Iowa 443, 170 N. W. 532, and from Pierce v. Bekins Van & Storage Co., 185 Iowa 1346, 172 N. W. 191, some statements where we have held that the Workmen's Compensation Law, being remedial, is to receive a broad and liberal construction in aid of accomplishing the object and purpose of the enactment. But the opinion rejects the legal principles which induced this court to rule that the Workmen's Compensation Act is to be liberally construed and holds that because the act is of a "taxing nature," then the rule applies: " * * * that in tax cases the general rule for statutory construction is against the taxing body."

The Moorman case was the first case to reach this court where the Iowa Unemployment Compensation Law, now the Iowa Employment Security Law (chapter 77.2, Code of 1939), was involved. Such laws had been held to be a valid exercise of the taxing powers of a state. Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327. Because the law was of a taxing nature, we applied the general rule of strict construction applicable to general revenue taxing statutes. I feel that we were in error in adopting the rule of strict construction. The act can only be regarded as enacted in the interest of the public welfare to provide for assistance to the unemployed. It is an exercise of the police power for the purpose of protecting the health, morals, and welfare of the people by providing a cushion against the hardships suffered by those who, without fault of their own, are temporarily out of employment. Since its purpose is highly remedial, it should receive a liberal construc-

tion. I feel fortified in this view by the decisions of other jurisdictions showing a clear majority who favor the rule of liberal construction. The decisions of eight states, including Iowa, indicate adherence to the rule of strict construction for such statutes. Atkisson v. Murphy, 352 Mo. 644, 179 S. W. 2d 27; Guaranty Mtg. Co. v. Bryant, 179 Tenn. 579, 168 S. W. 2d 182; McCain v. Crossett Lbr. Co., 206 Ark. 51, 174 S. W. 2d 114; State ex rel. Oklahoma Emp. Sec. Comm. v. Tulsa Flower Exch., 192 Okla. 293, 135 P. 2d 46; Broadway v. Alabama Dry Dock & Shipbuilding Co., 246 Ala. 201, 20 So. 2d 41; Maryland Unemployment Comp. Board v. Albrecht, 183 Md. 87, 36 A. 2d 666; State v. Kenyon, Tex. Civ. App., 153 S. W. 2d 195; Louisville Title Mtg. Co. v. Commonwealth ex rel. Unemp. Comp. Comm., 299 Ky. 224, 184 S. W. 2d 963.

At least twenty other states have now announced that the rule of liberal construction should apply to such legislation.

In *Lindley v. Murphy*, 387 Ill. 506, 511, 56 N. E. 2d 832, 835, the court stated:

"The primary purpose of the Unemployment Compensation Act, as stated in section 1, is to afford relief to those involuntarily unemployed and their families. Amelioration of economic insecurity incident to involuntary unemployment is the objective to be effectuated. The statute itself is thus an exertion of the police power of the State, the legislation is remedial, and is to be liberally construed to the end that its basic purposes may be achieved. * * * The involuntary contributions required to maintain the system of unemployment compensation are not general taxes, and the statute is not a taxing statute. (Zehender & Factor, Inc. v. Murphy, 386 Ill. 258 [53 N. E. 2d 944]). In short, the Unemployment Compensation Act is not a revenue law * * * ."

See, also, Grant Contracting Co. v. Murphy, 387 Ill. 137, 56 N. E. 2d 313; Zelney v. Murphy, 387 Ill. 492, 56 N. E. 2d 754.

In Maine Unemployment Comp. Comm. v. Androscoggin Junior, Inc., 137 Maine 154, 160, 16 A. 2d 252, 255, the Supreme Judicial Court of Maine stated, with regard to such a statute:

" * * * it may be regarded as enacted in the interest of the public welfare in providing for assistance to the unemployed and so be entitled to receive a liberal interpretation. 59 C. J., Sec. 656, pages 1105, 1106. Relief of unemployment is a public purpose. Carmichael et al v. Southern Coal & Coke Co., 301 U. S., 495, 515, 57 S. Ct., 868 [81 L. Ed. 1245, 109 A. L. R. 1327]."

In Singer Sewing Mach. Co. v. Industrial Commission, 104 Utah 175, 189, 134 P. 2d 479, 485, the Supreme Court of Utah stated:

"(a) The Unemployment Compensation Law was enacted under and as an exercise of the police power of the state.

"(b) Its purpose is remedial to protect the health, morals, and welfare of the people by providing a cushion against the shocks and rigors of unemployment.

"(c) Being remedial under the police power and not imposing limitations on basic rights, it should be liberally construed."

See, also, Northern Oil Co. v. Industrial Comm., 104 Utah 353, 140 P. 2d 329.

In Young v. Bureau of Unemployment Compensation, 63 Ga. App. 130, 135, 10 S. E. 2d 412, 415, the Court of Appeals of Georgia stated:

"The courts, as well as the administrator of the unemployment law, in construing and applying the provisions of such law must liberally construe and apply such law in the light of the public policy of this State, as declared in section 2 of the act. The courts shall be guided by the fact that the unemployment-compensation law is intended to provide some income for persons who are, without fault of their own, temporarily out of employment."

Without quoting from any more cases, I list the following decisions holding for the rule of liberal construction of the Unemployment Compensation Law: California Employment Comm. v. Black-Foxe Military Institute, 43 Cal. App. 2d Supp. 868, 110 P. 2d 729; California Emp. Comm. v. Butte County

Rice Gr. Assn., 25 Cal. 2d 624, 154 P. 2d 892; California Emp. Comm. v. Los Angeles D. T. S. News Corp., 24 Cal. 2d 421, 150 P. 2d 186; Waterbury Sav. Bk. v. Danaher, 128 Conn. 78, 20 A. 2d 455; Robert C. Buell & Co. v. Danaher, 127 Conn. 606, 18 A. 2d 697; Hagadone v. Kirkpatrick, Idaho , 154 P. 2d 181; State ex rel. Merion v. Unemployment Comp. Bd. of Rev., 142 Ohio St. 628, 53 N. E. 2d 818; Miller Auto Gear & Parts Co. v. Unemployment Comp. Comm., 132 N. J. Law 34, 38 A. 2d 292; Singer Sewing Mach. Co. v. New Jersey Unemp. Comp. Comm., 128 N. J. Law 611, 27 A. 2d 889, affirmed 130 N. J. Law 173, 31 A. 2d 818; Unemployment Comp. Comm. v. Collins, 182 Va. 426, 29 S. E. 2d 388; Cuddy-Gardner Co. v. Unemployment Comp. Bd., 69 R. I. 36, 31 A. 2d 8; Sandoval v. Industrial Comm., 110 Colo. 108, 130 P. 2d 930; News Pub. Co. v. Verweire, 113 Ind. App. 451, 49 N. E. 2d 161; Knox Consol. Coal Corp. v. Review Board, Ind. App., 43 N. E. 2d 1019; Review Bd. of U. Comp. v. Mammoth L. & A. Ins. Co., 111 Ind. App. 660, 42 N. E. 2d 379; Rochester Dairy Co. v. Christgau, 217 Minn. 460, 14 N. W. 2d 780; Godsol v. Unemployment Comp. Comm., 302 Mich. 652, 5 N. W. 2d 519, 142 A. L. R. 910; Minor Walton Bean Co. v. Michigan U. C. Comm., 308 Mich. 636, 14 N. W. 2d 524; O'Brian v. Michigan Unemp. Comp. Comm., 309 Mich. 18, 14 N. W. 2d 560; Singer Sewing Mach. Co. v. State Unemp. Comp. Comm., 167 Or. 142, 103 P. 2d 708, 116 P. 2d 744, 138 A. L. R. 1398; Puget Sound Bridge & D. Co. v. State Unemp. Comp. Comm., 168 Or. 614, 126 P. 2d 37; In re Yakima Fruit Growers Assn., 20 Wash. 2d 202, 146 P. 2d 800; Sisk v. Arizona Ice & Cold Storage Co., 60 Ariz. 496, 141 P. 2d 395; Brown v. Haith, 140 Neb. 717, 1 N. W. 2d 825; Unemployment Comp. Comm. v. Jefferson Standard L. Ins. Co., 215 N. C. 479, 2 S. E. 2d 584; Grace v. Magruder, App. D. C., 148 F. 2d 679, certiorari denied,—U. S. —, 66 S. Ct. 24, 90 L. Ed.—; Glenn v. Beard, 6 Cir., Ky., 141 F. 2d 376, certiorari denied 323 U. S. 724, 65 S. Ct. 57, 89 L. Ed. 582.

The word "tax" does not appear in the Iowa Employment Security Law. It has been judicially placed in such legislation by decisions upholding such laws as a proper exercise of taxing powers. But the court designation of an exaction, while proper

for a discussion of validity, still leaves the question of whether the statute we have named a "taxing" statute should be liberally or strictly construed. The word "tax" has a first meaning which denotes an enforced contribution for the support of government and the amount is regulated by its necessities. In this field the government is exercising inherent power, essential to the very existence of independent government. The power to so tax is purely legislative and if there is any question whether the law was intended to reach this person or this property the statutory authorization must be shown for the courts cannot supply a legislative omission. For such a law the rule of strict construction against the taxing body is applicable. 59 C. J. 1131, section 670. But today we call many acts which are not revenue acts taxing statutes. Such acts are sustained by the police power. They are taxes in the broad sense that they are a government-imposed pecuniary burden to support an appropriate governmental function, to carry out a public policy that will promote the general public welfare or remedy an existing situation that is detrimental to the public welfare, or they are taxes in the sense of an exaction for the performance of an act which the state has the power to regulate or prohibit. Courts sometimes scrutinize such statutes to find the public purpose but, once found, the general rule that statutes founded upon public policy must be liberally construed to carry out that policy is the guiding rule for construction.

The Iowa Employment Security Law is founded upon the public policy of this state declared to be to relieve involuntary unemployment "by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment * * * ." Section 1551.08, supra. The contributions go into a fund that is not a part of the public revenue and the amount employers pay varies in accordance with their benefit experience. Section 1551.13. When we state that the public policy is to relieve unemployment—and this is an appropriate state endeavor—we merely state the obvious. The point is that with such a public policy announced we will assume the legislature intended that every section of the act

is to be liberally interpreted to the end that the policy objective be achieved. The interpretation guide of section 1551.08 is a proper legislative direction to apply the provisions of the act liberally to protect all the employees who can fairly be said to be within the intendment of the act against the possible dangers of future unemployment. I would overrule the statements in the Moorman case announcing the rule of strict construction for this statute and declare that the rule of liberal construction to carry out the public policy to relieve unemployment is the proper rule of construction to be followed.

I would hold that construction of the original primary line, and all extensions thereto and all service lines to customers from the primary line, was a part of the company's usual business as an electric transmission company, and, consequently, I would affirm the case.

BLISS, GARFIELD, and OLIVER, JJ., join in this dissent.