**BLUE RIDGE RURAL ELECTRIC CO-OPERATIVE, Inc., Appellant,**

v.

**James Earl BYRD, Appellee.**

**No. 7183.**

United States Court of Appeals Fourth Circuit.

Argued June 7, 1956.

Decided Oct. 1, 1956.

See, also, 215 F.2d 542.

---

Ray R. Williams and Wesley M. Walker, Greenville, S. C. (Leatherwood, Walker, Todd & Mann and Williams & Henry, Greenwood, S. C., on brief), for appellant.

Henry Hammer, Columbia, S. C. (Henry H. Edens and William E. Chandler, Jr., Columbia, S. C., on brief), for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and MOORE, District Judge.

SOPER, Circuit Judge.

James Earl Byrd, an electric lineman in the employ of R. H. Bouligny, Inc., a construction company, lost both forearms on February 17, 1953, when he accidentally came in contact with a live wire while working on a construction project of Blue Ridge Rural Electric Cooperative, Inc., which was engaged in the distribution of electricity in rural areas. Byrd filed a claim against his employer under the Workmen's Compensation Act of South Carolina and collected full benefits. He then brought the present suit against the Cooperative claiming that the accident was due, at least in part, to its negligence. Blue Ridge defended on the grounds (1) that the accident was not

due to its negligence but to the negligence of Bouligny and the contributory negligence of Byrd, and (2) that even if Blue Ridge were negligent, Byrd's only remedy was afforded by the Compensation Act since the work being done by the contractor was part of the business of the Cooperative. The District Judge rejected the contention that the liability of the Cooperative was confined to the payment of compensation and submitted the negligence questions to the jury, which found a verdict for the plaintiff in the sum of $126,786.80, and the defendant appealed.

Blue Ridge Rural Electric Cooperative was organized as a rural electric cooperative in 1939 under the provisions of the Rural Electric Cooperative Act of South Carolina, Chapter 15 of the South Carolina Code of 1952. Section 12–1021 of this statute authorizes the organization of cooperative nonprofit membership corporations for the purpose of supplying electric energy and extending its use in rural areas; and § 12–1025 empowers a cooperative to generate, accumulate and distribute electric energy in rural areas to its members and to construct, acquire, maintain and operate electric generating plants, buildings and equipment and any and all kinds of property which may be necessary or convenient to accomplish the purposes for which the corporation is organized.

Acting under this statute, Blue Ridge has engaged in supplying electricity to the rural people of four counties in South Carolina, and in the construction and maintenance of distribution lines, transmission lines and substations. The system was begun by the State Rural Electrification Authority, and comprised 300 miles of line serving 1100 consumers when it was taken over by Blue Ridge in 1939. Since then it has steadily grown until at the time of the trial in the District Court in 1955, it had 2000 miles of line and 10,816 consumers or members.

On June 23, 1952, Blue Ridge let a contract to Bouligny in order to expedite its construction work. It had secured a government loan under a loan agreement approved by the Rural Electrification Administration, acting by the Administrator, and the construction contract was executed in conformity with the provisions of the loan agreement. The contract called for the construction of approximately 24.2 miles of new electric transmission and distribution lines, the reconversion, rephasing and rehabilitation of approximately 87.7 miles of existing lines, and the construction of two appurtenant substations and a breaker station.

The accident in this case happened at one of the substations, known as Walhalla, when the lineman came in contact with a live wire on a line which the contractor was converting from a one-phase or one-wire line to a two-phase or two-wire line. It served the residents of a rural section known as the Ebenezer Community and was connected at a right angle with a transmission line on a highway at a point about 1250 feet from the Walhalla station.

The conversion required the relocation of a portion of the Ebenezer line where it left the highway, and the running of a new line from the new connecting point to the substation; and meanwhile it was necessary to do the work in such a manner as to continue the service to the Ebenezer Community as far as it was possible to do so. The construction contract expressly provided in this respect that at the beginning of each day the contractor would notify the owner of the lines to be de-energized and at the end of each day the contractor would notify the owner of the lines to be re-energized, and that in each instance the owner would take the necessary steps to comply with the notice.

On the day of the accident the Walhalla substation was nearly finished but it had not been turned over to the owner and was not scheduled to be energized for another thirty days. The wires running from it to the new connecting point on the Ebenezer line were also in place and one of them received current from another source and was used to service the community. It was brought from the

connecting point to a double-end pole located within the fenced area of the substation at a distance of seventy-five feet, and ran thence to the substation itself. It was intended that the current should not run to the substation but should be cut off at the pole by postponing the installation of a connecting device thereon, known as a jumper, until the substation was completed. Unfortunately, through a mistake of a foreman of the contractor, a permanent closed jumper was placed on the pole and a foreman of the owner was notified that it was safe to energize the line, and he did so without inspecting the line himself. An examination would have shown that the current would run through to the substation. In this situation another foreman of the contractor, who also failed to inspect the line, took the plaintiff lineman to the substation and directed him to make a connection between the line outside and the equipment inside the substation, and the lineman in attempting to do so caught hold of the live wire, believing it to be dead, and was burned.

That the accident was caused primarily by the negligence of employees of the Bouligny company, which is not a party to the instant suit, was abundantly proved and is not in dispute, and on this account Blue Ridge, the defendant company, contends that it should be exonerated. It has been noted above, however, that the construction contract imposed upon Blue Ridge alone, the duty of putting on and cutting off the current during the course of the work when notified by the contractor; and there was additional evidence offered by a qualified electrical engineer that standard safety procedure in electrical work requires that a person who is responsible for letting power into existing lines to which new lines are connected, must personally inspect the connection before energizing the old lines. Because of this evidence, the issue of negligence on the part of Blue Ridge was submitted to the jury.

Blue Ridge also defended on the ground that recovery was precluded by contributory negligence on the part of the lineman who could have readily seen the permanent bond on the double-end pole only seventy-five feet way, if he had taken the pains to trace the wire from the substation to the pole. The evidence, however, showed not only that he was acting under the orders of his superior when he was hurt, but that he relied on the standard safety regulation that a new construction built by a contractor must not be energized until it has been inspected, approved and turned over to the owner. Accordingly, the issue of contributory negligence was also submitted to the jury.

■ We do not question the submission of the issue of contributory negligence to the jury under these circumstances. The sufficiency of the evidence to show negligence on the part of the Co-operative is, however, not free from doubt, but it is not necessary to decide this point in view of the basic defense that the lineman's recovery was limited to the benefits provided by the Workmen's Compensation Act of the State of Carolina, Title 72 of the South Carolina Code of 1952. That statute provides that when an owner undertakes to execute any work which is a part of his trade or business and contracts with any other person for the execution of the whole or any part thereof, the owner shall be liable to pay to any workman employed in the work any compensation under the Act which he would have been liable to pay if the workman had been immediately employed by him. § 72–111.

When a contractor agrees to do work for another person which is not a part of the trade or business of the other person and contracts with a subcontractor to do the whole or part of the work, the contractor becomes liable to pay compensation to the workmen of the subcontractor. § 72–112. A like provision for the protection of the workmen of a sub-subcontractor is made in § 72–113.

When a principal contractor [1] is liable to pay compensation under these sections, he is entitled to indemnity from any person who would have been liable to pay compensation independently of the sections. § 72–115. A workman may recover compensation from the subcontractor instead of from the principal contractor, but not from both. § 72–116. Every employer who accepts the compensation provisions of the Act is required to secure the payment thereof by insurance or otherwise. § 72–401 et seq.

The rights and remedies granted by the statute to an employee exclude all other rights and remedies of the employee as against his employer at common law or otherwise, on account of injury, § 72–121; and the acceptance of an award under the statute or the procurement and collection of a judgment in an action at law is a bar to proceeding further with the alternate remedy. § 72–123.

It was conceded in the Court below that both Blue Ridge, the owner, and Bouligny, the contractor had complied with and were operating under the Compensation Act, and that after the injury the lineman had elected to receive and had accepted full benefits thereunder from Bouligny; and it was also conceded that if the work being done at the time of the injury constituted a part of the business of the cooperative, the present suit must fail. The burden of the appellee's argument rests on the assertion that the construction work done by Blue Ridge itself was limited to everyday operations of hooking up connections for customers and did not include extensive line construction, and in view of the fact that the lineman was hurt while attempting to connect the substation with the new line, it is contended with especial emphasis that the construction of the substation was not part of the business of the Cooperative.

The uncontradicted evidence as to the construction work done by the employees of Blue Ridge may be summarized as follows: It maintains an outside crew of 8 linemen and 8 groundmen, one-third of whose time is spent in maintenance and two-thirds in construction work. It constantly builds new lines to new consumer members and builds extensions, some short and some long, up to eight miles in length; but since the end of World War II so many persons in rural areas have demanded electrical service that it has employed independent contractors to do a large part of the construction work, while continuing to do a considerable part through its own men. All of the construction work, whether done by itself or by outside contractors, is done under the supervision of the Southern Engineering Company, an independent organization conducted by engineers, which is employed by Blue Ridge to make sure that the system complies with the requirements of the Rural Electrification Administration of the United States.

The testimony with respect to the construction of the substations of Blue Ridge, stated most favorably to the appellee, discloses that originally Blue Ridge built three substations with its own facilities, but that all of the substations which were built after the war, including the six it was operating at the time of the accident, were constructed for it by independent contractors, and that at the time of the accident it had no one in its direct employ capable of handling the technical detail of substation construction.

There can be no doubt that all of the work covered by the Bouligny contract was of the class which Blue Ridge was empowered by its charter to perform and that all of it was necessary to enable it to serve the growing needs of the rural communities. Furthermore, the main actor in the whole enterprise was the Cooperative itself. This is seen the more clearly when we round out, by way of illustration, the whole picture of what

---

1. It was said in Marchbanks v. Duke Power Co., 190 S.C. 336, 362, 2 S.E.2d 825, that the term "principal subcontractor" is synonymous with owner.

was done in the formation and performance of the Bouligny contract. The project was begun when Blue Ridge secured a loan of $334,300.00 from the United States under the Rural Electrification Act of 1936 as amended 7 U.S.C.A. § 901 et seq., to finance the construction work above described, the lines to be located along such routes as the owner with the approval of the Administrator should designate. Blue Ridge then entered into an engineering service contract with the Southern Engineering Company, whereby the Engineer agreed to render the engineering services necessary for the design and construction of the project. This contract provided for the preparation of plans and specifications by the Engineer, the approval thereof by the owner, the selection of a contractor by competitive bidding, the staking of the project by the Engineer after the procuring of rights of way and easements by the owner, and the supervision by the Engineer of all the details of the construction work as the representative of the owner.

The construction contract with Bouligny conformed to the requirements of the loan agreement. It defined the Engineer as one employed by the owner with the approval of the Administrator to supervise the construction of the project; it authorized the owner, acting through the Engineer with the approval of the Administrator from time to time to make changes in the plans and specifications; it subjected the manner of construction and all materials and equipment used therein, to the inspection and approval of the Engineer, and it required the contractor to maintain an office for the Engineer on the site to facilitate the work of supervision. The contractor agreed to furnish the materials according to the specifications at agreed prices; but the contract showed that the materials of which the substations were to be constructed were purchased by the Cooperative. The Cooperative assumed the responsibility and agreed to perform the service of de-energizing and re-energizing existing lines during the progress of the work.

From this description there can be no doubt that Blue Ridge was not only in the business of supplying electricity to rural communities, but also in the business of constructing the lines and substations necessary for the distribution of the product, if these words are given their ordinary significance. The appellee says, however, that in the meaning of the compensation statute, construction work is not a part of an owner's business, unless it is of such a character that ordinarily it would be performed by his own employees; and reliance is placed on the evidence that since the war Blue Ridge has sublet the construction of substations to outside contractors, and the line work performed by its own employees has been limited in extent. We do not think that this interpretation of the statute is tenable. It will be noticed in the first place that § 72–111 makes specific provision for the performance by a contractor of work which is part of the owner's business and in such case imposes upon the owner the same liability to pay compensation to the contractor's workmen as if they were immediately employed by him. In other words, the statute recognizes the practice of letting out to others the actual performance of one's business and subjects the owner to liability for compensation to injured workers. The manifest purpose is to afford the benefits of compensation to the men who are exposed to the risks of its business, and to place the burden of paying compensation upon the organizer of the enterprise. In consequence, both the owner and the contractors whom he engages to do his work, are subjected to the requirements of the Act, and the workers receive double protection.

The decisions of the Supreme Court of South Carolina are in accord with these views. Very similar was the case of Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825, where the power company, like Blue Ridge, was in the business of distributing electricity which from

time to time required the erection of poles and transmission lines. In carrying out this purpose, it contracted with an outsider to paint 170 metal poles, and one of his workmen was injured while doing the work and sued the power company in an action of tort. It was held that the suit could not be maintained and that the worker's only remedy was under the Compensation Statute which relieved the power company of common law liability. Circuit Judge Oxner, now a Justice of the Supreme Court of the State, whose opinion was set out in full and approved by that Court, described the purpose of the Act in these words, 190 S.C. 343, 344, 2 S.E.2d 825, 828:

"It was evidently realized by the General Assembly that it would not be fair to relieve the owner of compensation to employees doing work which was a part of his trade or business by permitting such owner to sublet or subcontract some part of said work. Doubtless in many instances such contractor would be financially irresponsible, or the number of employees under him would be so small, as in this case, that such contractor would not be required under the Act to carry compensation insurance. It was therefore, provided under the first paragraph that where such work in which the employee was engaged was part of the owner's trade or business, the owner would be responsible in compensation to all employees doing such work, whether employees of an independent contractor or not."

A like result was reached in Boseman v. Pacific Mills, 193 S.C. 479, 8 S.E.2d 878, where, in the execution of a contract between the owner of the mill and an independent contractor for the painting of a water tank maintained by the mill for fire protection, an employee of the contractor was killed by the unexplained explosion of the tank. A claim against the mill for Workmen's Compensation was resisted on the ground that the workman was not an employee of the mill and that the painting of the tank was not part of its trade or business, because the work was of such dangerous and unusual character that it was never done by the regular employees of the mill but was always let out by contract to an experienced steeplejack. In overruling this contention, the Court said, 193 S.C. at page 483, 8 S.E.2d at page 880:

"The testimony was to the effect that the mill furnished all the paint, the ladders and any lumber or scaffolding necessary to do the work. As already seen, the contract itself contained a postcript that 'the above work is all subject to inspection and approval by representatives of Pacific Mills'. The tank was an integral part of the mill business. There was also testimony to the effect that the mill desired that the work on the inside of the tank be completed as soon as possible so that its every day, ordinary service, that of fire protection, could be resumed, it being shown that the mill depended upon this tank for such protection. The very nature of the work done by the mill, that of the manufacture of cotton into cloth, especially required the best of protection against fire. Hence, this tank was particularly necessary and essential in the operation and carrying on of the business of the mill. It, therefore, follows that the painting of the tank was such a part of the trade, business or occupation of the Pacific Mills as would constitute Martin a subcontractor and thus render the mill liable to the beneficiary of Boseman for payment of compensation." [2]

2. For other South Carolina cases in which the owner was found liable for compensation to injured employees of subcontractors, see Kennerly v. Ocmulgee Lumber Co., 206 S.C. 481, 34 S.E.2d 792, where the owner of a sawmill let a contract for cutting timber on its own lands under its supervision; Hopkins v. Darlington

The appellee seeks to distinguish some of these cases on the ground that in them the injured man was engaged in maintenance work ordinarily performed by the employees of the owner in the operation of the business; but it is manifest that it would defeat the purpose of the Act to make the prime mover of an enterprise liable to pay compensation for injuries suffered in the work of maintenance or repair, whether he is negligent or not, but to exempt him in the more important and more extensive field of new construction. For the same reason, it cannot be held that an owner **is** not obliged to provide compensation for injuries incurred in the course of construction work performed on his behalf as part of his business, if he customarily lets the work out to independent contractors and does not perform it himself. It will have been noticed that § 72-111 of the Act expressly covers an owner who undertakes to perform any work which is part of his business and contracts with any other person for the execution *"of the whole or any part of the work"*. Thus, the statute recognizes that work done at the behest of the owner is owner's work; and unless he is held liable to pay compensation for injuries incurred in its progress the underlying purpose of the Act will be frustrated. The quotation from Boseman v. Pacific Mills set out above is particularly pertinent in this connection, as are also the decisions in Purkable v. Greenland Oil Co., 122 Kan. 720, 253 P. 219 and Wisinger v. White Oil Corp., 5 Cir., 24 F.2d 101, cited with approval in Marchbanks v. Duke Power Co., supra. As was said in that case, 190 S.C. 363, 2 S.E.2d 836:

"It is the clear purpose of the Act to make the owner, the person who is interested in having the work done, liable to the employee so injured."

It cannot be denied that Blue Ridge was vitally concerned in the construction of the equipment covered by the Bouligny contract, without which the distribution of its product would have been impossible.

The cases on which the appellee relies are distinguishable on the ground that the work done, although useful to the business, was performed in carrying on a trade or occupation in which the owner of the business was not engaged. Thus, in Miles v. West Virginia Pulp & Paper Co., 212 S.C. 424, 48 S.E.2d 26, the owner of a pulpwood plant engaged a contractor to supply him with pulpwood on a commission basis; in Benbow v. Edmunds High School, 220 S.C. 363, 67 S.E. 2d 680, the school authorities employed an electrical contractor to repair a lighting fixture in a high school; in Horrell v. Gulf & Valley Cotton Oil Co., 15 La. App. 603, 131 So. 709, a contractor was employed to install a furnace in an oil refinery; in Packett v. Moretown Creamery Co., 91 Vt. 97, 99 A. 638, L.R.A.1918 F, 173, a contractor was employed to erect a building for a creamery; and in our decision in Sears Roebuck & Co. v. Wallace, 4 Cir., 172 F.2d 802, a corporation engaged in the sale of goods contracted with a builder to make certain alterations in a storage warehouse. In Glidden Rural Elec. Cooperative v. Iowa Employment Security Commission, 236 Iowa 910, 20 N.W.2d 435, the cooperative was successful in resisting an assessment for unemployment compensation tax on the grounds that it had never had as many as 8 employees and, although it had let contracts for the construction of lines, it had never engaged in the construction work except to make service connections, and hence the Court held that the work done by the contractor was not a part of the *usual* trade or bus-

Veneer Co., 208 S.C. 307, 38 S.E.2d 4, where the owner of the plant subcontracted the cutting of timber on its lands; Smith v. Fulmer, 198 S.C. 91, 15 S.E. 2d 681, where a bridge builder sublet the making of fills and the laying of pave-

ment to a subcontractor. See also the decisions of this Court in Doane v. E. I. Du Pont de Nemours & Co., 4 Cir., 209 F.2d 921; Berry v. Atlantic Greyhound Lines, 4 Cir., 114 F.2d 255.

iness of the cooperative within the terms of the statute.

We conclude that the work performed by Bouligny under the contract was done in carrying on the trade or business of the Cooperative.

In the District Court the plaintiff conceded that he had no case if the work in which he was engaged when he was injured was part of the trade or business of Blue Ridge. He now contends however, in the alternative, that even if the work was of this character he is not precluded from bringing the present action because Bouligny paid the compensation award and hence the acceptance of the award does not bar his suit under the provisions of § 72–123 of the statute. Although the point is now raised for the first time we, nevertheless, consider it since it goes to the heart of the defense and the parties have discussed it in the briefs on this appeal.

■ The contention in our opinion cannot be sustained. It involves the erroneous assumption that although the statute imposes an absolute liability upon the owner of the business to provide compensation, usually effected by carrying insurance for the employees of the independent contractor, the owner loses the offsetting benefit of immunity from suit at law provided by the statute, if the injured workman elects to receive compensation from the contractor. It is generally held under statutes of this kind that both the owner of the business and his independent contractor, or the principal contractor and his subcontractor where they are the parties concerned, are exempt from suit. A leading case on the subject is State, to Use of Hubert, v. Benjamin F. Bennett Bldg. Co., 154 Md. 159, 140 A. 52, where the building company was sued in an action at law for the death of an employee of a subcontractor who had undertaken to lay tile floors in a building under construction. Prior to the institution of the suit an award of compensation under the Maryland compensation statute had been paid by the subcontractor. The Maryland statute like that of South Carolina provides that where a principal contractor undertakes under contract the execution of any work in the way of his trade or business and contracts with any other party as subcontractor for the execution of the whole or any part of the work, the principal contractor shall be liable to pay any workmen employed in the execution of the work any compensation under the Act which he would have been liable to pay if the workmen had been immediately employed by him. In considering the effect of the statute and sustaining the defense that the principal contractor was exempt from suit at law the Court said, 154 Md. 162–163, 165, 167–168, 140 A. 53, 54, 55:

"* * * The effect of this provision, when brought into operation through the designated state of circumstances, is to impose the absolute liability of an employer upon the principal contractor when he was not in law the employer of the injured workman. The result, then, is that, where the prescribed conditions exist, the principal contractor becomes by the act the statutory employer of any workman employed in the execution of the work. This absolute statutory liability is not affected by the fact that it is later provided in section 62 that the workman may elect whether he shall enforce the compensation against the principal contractor or the subcontractor, or that, whenever an employee proceeds against the principal contractor, the latter shall have the right to join the subcontractor or any intermediate contractor as defendant or codefendant in the case; or that, when the principal contractor is liable to pay compensation pursuant to this section, he shall be entitled to indemnity from any employer who would have been liable to pay compensation to the employee independently of section 62. These provisions leave unimpaired the primary liability imposed by the

statute upon the principal contractor. The first gives to the workman the choice of two primary liabilities, as but one is enforceable by him. The second is a matter or procedure, and the third relates to the question of indemnity to the principal contractor by the subcontractor, and neither concerns the liability of the principal contractor to the workman. This primary liability, so imposed by statute upon the principal contractor, is not based upon contract, since the legislation is predicated upon the fact that no contractual relation, as master and servant, exists between the principal contractor and the workman; nor does it flow from a breach of duty, because the liability arises independently of the existence of fault on the part of the principal contractor. This legislation, however, finds its constitutional support in the consideration that the general welfare is promoted and conserved by requiring the employer and the workman to yield something of their respective rights toward the establishment of a principle and plan of compensation for their mutual protection and advantage. * * *

"It may be said that there were two employers of the dead man. One was his immediate employer, the subcontractor, whose relation was founded in contract; and the second was his more remote statutory employer, the principal contractor, whose status, with the rights and liabilities growing thereout, was created and determined by law. * * *

"If the construction by the appellant prevail, the dependent may recover compensation of the subcontractor, and also damages at common law against the negligent principal contractor, who is thus taken out of the act by the dependent's choosing to file her claim against the subcontractor, but who would remain within the act, if she should file her claim for compensation against the principal contractor. In short, the liability of the principal contractor would not be fixed and determined by law, but by the arbitrary exercise of the dependent's will. The result of this contention would be to impose upon the general contractor an onerous and dual liability for compensation or damages, at the election of the employees of a subcontractor, while limiting his liability to his own immediate workmen to compensation alone. This theory would deprive a class of employers within the act of their exemption from all liability save that of compensation, which is an essential part of the general legislative plan. A construction so antagonistic to the fundamental principles underlying the enactment will not be adopted. If an employer is within the act to bear its liabilities, he must remain to be accorded its immunities, in the absence of a clearly expressed legislative intention to the contrary."

The importance of this case for our purposes is seen by the approval given the decision in Marchbanks v. Duke Power Co. where, as in the pending case, the plaintiff claimed not only that the work being done was not part of the defendant's business but also that the remedy afforded by the Compensation Act was not exclusive. The Court said, 190 S.C. 351–352, 2 S.E.2d 831:

"I now come to plaintiff's third and last contention to the effect that his remedy under the Compensation Act is not exclusive. Most of the cases cited as sustaining this contention involve acts which are materially different from that in force in this State in that no direct liability is imposed upon the principal or owner. These acts require such owner or principal to see that the contractor carries compensation insurance for the protection of his employees and only in instances where he fails to do this does liability on his part arise.

"The best reasoned case that I have found on this question is that of State [to Use of Hubert] v. Benjamin F. Bennett Bldg. Co., 154 Md. 159, 140 A. 52, 53. It involves an act similar in principle to that of this State."

The Court then quoted extensively from the decision of the Maryland Court.

In opposition, the appellee calls attention to the unreported decision of the District Court of the United States for the Eastern District of South Carolina in Ballard v. Southern Oil Co., 145 F. Supp. 882 and the decision in Younginer v. J. A. Jones Const. Co., 215 S.C. 135, 54 S.E.2d 545. In the Ballard case it was held that an action at law would lie against the owner of a building for the death of a workman who was killed while working on the wall of a building for the owner as an employee of an independent contractor, although his estate had recovered compensation from his immediate employer. The decision was based on the theory that § 72–111 of the South Carolina Compensation Act imposes liability on an owner to provide compensation only when the contractor fails to provide coverage. We find it impossible to follow this decision since it seems to us to be in direct conflict with the decision of the Supreme Court of South Carolina in Marchbanks v. Duke Power Co. and the cases cited therein.

The decision in Younginer v. J. A. Jones Const. Co. is relied upon because the Court in its opinion described the liability imposed upon the principal contractor by § 72–111 as secondary in nature; and this is taken by the appellee to mean that the principal contractor is only a guarantor and his liability to provide compensation arises only when the subcontractor fails to do so. We do not think that this interpretation of the language can be sustained. A claim for compensation was filed in the cited case by an injured man against his immediate employer under the South Carolina Act for an injury incurred in doing work outside the State; and it was necessary for the claimant to show that the contract of employment was made inside the State. For this purpose he relied on a previous contract of employment in the State between him and a subcontractor of the respondent which had been completely performed. The Court pointed out that the work in South Carolina and the claimant's employment therein had been completed long before the injury outside the State occurred, and also said that the liability of the principal contractor under the terms of the statute is secondary in nature, obviously meaning that the liability of a principal contractor to the employee of a subcontractor rests upon the existence of an employment contract between the subcontractor and his direct employees. The use of the term "secondary" in this context was not inconsistent with the existence of an absolute liability on the part of the principal contractor under the statute. It was pointed out in a note on the subject in 151 A.L.R. 1364, 1367 that in some jurisdictions the Compensation Acts instead of making the liability of the general employer dependent on the carrying of insurance by the independent contractor, directly impose what amounts to "an absolute although perhaps secondary liability" on the former for injury to employees of the latter. It was obviously in this sense that the phrase under consideration was used in the Younginer case. The opinion was written by Mr. Justice Oxner, who cited his former opinion in the Marchbanks case, and it is inconceivable that he intended to overrule that decision without expressly saying so.

For other decisions interpreting the varying terms of State Workmen's Compensation Acts see also 58 A.L.R. 894; Sweezey v. Arc Electrical Const. Co., 295 N.Y. 306, 67 N.E.2d 369, 166 A.L.R. 813.

The motion of the defendant in the District Court for a directed verdict in its favor should have been granted and, failing this, the subsequent motion of

the defendant for judgment in its favor *non obstante veredicto* should have been granted. The judgment of the District Court will therefore be reversed with direction to enter judgment for the defendant.

Reversed.