16084

MILES v. WEST VIRGINIA PULP & PAPER CO.

(48 S. E. (2d) 26)

*Messrs. C. T. Graydon* and *Henry H. Edens,* of Columbia, for Appellant,

*Messrs. Waring & Brockinton,* of Charleston, for Respondent,

426

*Messrs. Christie Benet* and *J. B. S. Lyles*, of Columbia, for Respondent,

May 27, 1948.

STUKES, J.: This is a workmen's compensation case. The controversy revolves around the fact of whether the claimant, who is appellant, was at the time of his injury an employee of the Paper Company which was the defendant, now respondent. Sec. 7035-2(b), Code of 1942. Appellant mistakenly contends that the finding of the Industrial Commission that claimant was an employee of the defendant was one of fact which the court cannot reverse if there was substantial supporting evidence. But that rule is inapplicable to jurisdictional facts, and findings of the Commission thereabout are properly reviewable by the courts which will conclude the issue in accord with the preponderance of the evidence. *Knight v. Shepherd*, 191 S. C. 452, 4 S. E. (2d) 906; *Tedars v. Savannah River Veneer Co.*, 202 S. C. 363, 25 S. E. (2d) 235, 147 A. L. R. 914; *McDowell v. Stilley Plywood Co.*, 210 S. C. 173, 41 S. E. (2d) 872. It was therefore within the jurisdiction, and hence it was the duty, of the reviewing court to examine the evidence in the consideration of the pertinent exceptions. It is

similarly within the function of this court to review the evidence and the factual conclusions of the Commission in order to test its jurisdiction to make the award of compensation which was reversed on appeal to the Court of Common Pleas.

In the absence of pertinent statutory definition, the courts have to have recourse to the common law to determine whether an injured workman of doubtful status is the employee of the employer against whom he asserts a claim for compensation. Horovitz, Workmen's Compensation, 1944, p. 236. Comment note, 134 A. L. R. 1029.

In the light of the principles stated we proceed to an examination of the evidence.

Claimant at the time of injury was what is called in the trade a "pulpwood producer" and was hauling by motor truck wood cut from land and timber in Fairfield County, which was not the property of respondent, for consignment by railway freight to the latter's manufacturing plant at Charleston, about 150 miles distant. His testimony will be summarized. He was hauling pulpwood on June 20, 1944, in the western section of Fairfield County when the truck overturned and crushed his leg. The truck was the property of the Paper Company and leased in writing to him. The instrument was placed in evidence. It provided for a rental to be paid by claimant to the Company of $10.00 per car of pulpwood hauled by the truck which should be used exclusively for the purpose of hauling pulpwood for shipment to the Company, the latter to pay for repairs but claimant to provide gasoline and oil; that the Company should license the truck and carry insurance against liability to third persons for personal injuries and property damage. There were other provisions which are unimportant in the present inquiry.

Claimant said in testimony that he paid as rental for the use of the truck $20.00 per week if it was used for three

days but when hauling was interrupted by rain, the weekly rental would be $10.00, which was deducted from the payments to him for the pulpwood. He said that Mr. Hood and Mr. Frick, the latter at that time an employee of the Paper Company, paid for the pulpwood upon which he received a commission of $4.97 per cord for hauling and loading it, which figure he later said was $5.97. That Hood and Frick furnished him with gasoline ration stamps; that he paid the laborers who assisted him in hauling; that sometimes he also cut pulpwood but generally it was cut by farmers; that he would locate pulpwood and present an inventory to Frick who would pay the owners direct by check or give him a check for the purchase price which he would cash and distribute to the sellers; that Mr. Frick would inspect the standing pulpwood to determine whether it was in the stated amounts; that after it was cut he hauled it for shipment to the Paper Company "through Hood per E. A. Miles" (claimant), in which form the bills of lading were issued; that Hood and Frick gave him shipping instructions and he was paid for each carload through Mr. Hood, but Frick kept the books and issued the checks; that he had been cutting and hauling pulpwood intermittently for twelve or fifteen years, during the last five years principally for shipment to the Paper Company, and thereby earned about $100.00 a week, after payment by him of his laborers. He said that formerly he shipped a few cars of pulpwood for one W. G. Whitlock, but for the last seven or eight years he had dealt exclusively with Hood who had always paid him for cutting and hauling, and a few carloads of hardwood had been shipped to the Mead Corporation and some to Columbia Paper Company, all under instructions from Hood. He said that he had never been compensated by the Paper Company (respondent) nor had he any agreement with them, but that his dealings were with Hood. The following is an excerpt from claimant's testimony on cross-examination:

"Q. Did you just haul the wood? A. Yes, sir, I would get a piece of timber and locate it and I went thru and cut it. I cut some wood.

"Q. You would hire your men and pay for it and load the truck and put the wood on the car? A. They would buy the timber at so much a standing unit and my men would cut and haul it for so much.

"Q. In other words, you had an agreement with Mr. Hood you would cut and haul for so much a cord? A. Yes, sir.

"Q. When you did that you had the direction and control of the men who did it for you? A. Yes, sir.

"Q. The men working on the truck were your men you paid? A. Yes, sir.

"Q. You would just pay for such wood as you supplied? A. I was paid so much per cord.

"Q. You weren't paid any salary? A. No, sir, just a commission.

"Q. They bought it from Mr. Hood and he paid you for it? A. Yes, sir."

Frick, who was no longer in the employ of the Paper Company, testified for claimant and said that at the time of the latter's injury he (the witness) was a salaried employee of the Paper Company, hired by a Mr. Haines who was Field Manager, and the witness was instructed to help Hood look after the trucks, to help cruise timber and check wood which was shipped to the Paper Company. He said that Hood bought some tracts of timber and mortgaged them to the Paper Company, and that Hood shipped some to Union Bag Company in Savannah and to other concerns from time to time; that he could sell to any one he wished; that at the time of claimant's injury, the latter was hauling wood from farms, for which service he was paid by Hood; that the Paper Company deducted from the proceeds of shipments certain amounts for the credit of Hood to the payment of his mortgage to the Company, if any; that the

witness assisted Hood in any way that he could and pro-
tected the interest of the Company with respect to the latter's
loans to Hood; that claimant was not an employee of the
Paper Company but operated a truck leased from it; that
usually a mortgage was not given by Hood on pulpwood
cut in the woods (by others) but Hood paid for it and the
Paper Company reimbursed him; that occasionally there
was a railway embargo against shipments to the Paper
Company and it was agreed that on such occasions Hood
might ship pulpwood to other concerns so as to keep the
producers, such as claimant, in business; that Hood's com-
pensation consisted only of his commission of ninety-seven
cents. per unit of pulpwood; the witness kept Hood's
books; the "men in the field" (producers, such as claimant)
got the benefit of any overage of pulpwood in Hood's pur-
chases of tracts of timber, except that when sawmill timber
was included, Hood otherwise disposed of it to his profit and
similarly Hood's purchases sometimes included land which
he would thereby obtain and later sell, and in one such
case the producer bought the land from Hood; when a pro-
ducer bought the timber and did the cutting on his own ac-
count, he would get the whole proceeds of the sales of the
pulpwood except for Hood's commission; that all of the
transactions amounted to sales of pulpwood by Hood to the
Paper Company. In some of the transactions the producer
obtained the benefit of surplus in the wood over the estimate
and in such a case when the purchase mortgage was paid
from the proceeds of the sale of timber and pulpwood the
producer would benefit from such a good buy, but recently
timber prices have been so high that such bargains are no
longer available. Different contracts were made from time
to time, relating to different tracts of land and wood, be-
tween Hood and the producers. Usually Hood gave a pro-
ducer the profits derived from surplus wood on a tract which
was discovered by the producer, unless there was some other
agreement. Thus Hood sometimes received the profit result-

ing from a surplus of wood, and sometimes the producer did. Claimant operated two trucks and his estimate of $100.00 per week as his earnings is approximately correct. Mr. Hood advanced money to the producers on the bills of lading each week when settlements were made by the Paper Company for its purchases.

Through identification by this witness, Frick, there was introduced in evidence "Statement of John I. Hood's advances made on wood cut in woods and stored wood, as of January 28, 1944." The fourth item on this statement is of 175 units of wood (cut in the woods) of E. A. Miles (claimant), one of several producers, upon which $350.00 was advanced. A footnote to the effect that it was on "conservative estimate by Gene Frick."

James H. Graham testified for respondent that he is its "Manager of the Wood Department;" that the practice of the Paper Company is to locate a man who is already in the wood business or whom the Company thinks would make a good wood buyer, and contract with him to supply wood required by the Company, and he is called a wood dealer which is the classification used by the United States Government; that at the time here concerned ceiling prices and other regulations of the Federal OPA were in force; that the producers (such as claimant) were so designated by OPA and the producer's price established by that agency was $9.97 per unit (168 cubic feet) of pulpwood, and the dealer was allowed 98 cents per unit, thus making the cost of pulpwood to the Company $10.95 per unit. The Paper Company has no dealings with the producers (such as claimant). There are dealers who are unable to finance their purchases and upon application to the Paper Company the latter would have the timber cruised upon the basis of which the Paper Company would lend the dealer money for his purchase which would be secured by the dealer's mortgage of the property to the Company. The latter would be liquidated by agreed deductions by the Company from its payments

for the pulpwood delivered. If there is surplus of security, the dealer obtains the profit and may divide it with his producer or sub-dealer, which is a matter with which the Paper Company is not concerned. The Paper Company settles with the wood dealers weekly. The dealer has never been an employee of the Paper Company, nor has claimant, and the Company had no direct contact with the latter. At the time of claimant's injury (which was during the recent war) the procurement and supply of trucks was critical and in order to control them the Paper Company leased trucks to pulpwood dealers and producers, first at the rate of $10.00 per car of pulpwood hauled, later on a weekly rental of $20.00.

The contracts between the Paper Company and its dealers specified that the pulpwood passing thereunder should be produced in accord with the requirements of the Federal Fair Labor Standards Act of 1938, to accord with Governmental regulation requiring such stipulation. The procedure which has been outlined and which was followed by the Paper Company in the procurement of its raw materials was adopted because it was thought that dealers established in the wood business are better qualified to supply the needed wood than salaried employees. A profit motive serves as an incentive and the Paper Company thinks it costs it no more. When the Paper Company advances money by way of loans on tracts of timber it is not specified that the pulpwood when harvested shall be sold to the Paper Company. The latter expects that but does not always get it. The majority of wood dealers sell to various companies and the Paper Company has to keep in close touch with the dealers in order to get its supply of pulpwood.

In 1944 when Hood was shipping wood to many companies the Paper Company considered it necessary to station a man there to protect its interest, which accounts for Frick's presence and his help of Hood in his bookkeeping was a matter between them and without connection with

the Paper Company. Frick was formerly employed by Hood and is now working for him again. Hood is no longer heavily involved with the Paper Company and the latter does not have the interest which formerly required an employee in Frick's position.

When Hood purchases a tract of timber and obtains a loan from the Paper Company for the financing of it, the amount of the deduction in the settlements for shipments of pulpwood, on account of the mortgage indebtedness, is determined by agreement between Hood and the Company and is arrived at with reference to the estimates of the amount of timbr on the land. If the turnout of the wood produces an overage or surplus, it is Hood's profit, which he may or may not share with, or give to, his producers. If loss in the purchase results from a shortage in yield under the estimate, Hood takes the loss. The Paper Company does not bear or share profit or loss which results from inaccurate estimates. Hood may anticipate payment of his indebtedness to the Company on account of any loan on timber and not await the liquidation and shipment of pulpwood to the Paper Company. It may be paid by the sale of saw timber to others or by sale of the land.

The Paper Company obtained the gasoline ration tickets, furnished them to the dealer who gave them to the producers in order that the latter could get gasoline to run their leased trucks, which accorded with the desire of the Federal Office of Defense Transportation, this because the trucks were owned and licensed by the Paper Company.

Introduced in evidence was the contract between the Paper Company and Hood which was called a Pulpwood Purchase Order, and Hood a dealer. It was dated April 6, 1944, and was an agreement by the Company to purchase from Hood 7,000 units of pine pulpwood at the unit price of $9.97, and the Company agreed to pay the dealer 98 cents per unit as a "dealer's allowance" on all wood sold under the contract

which is not cut by the dealer but purchased by him in the condition delivered, during the period April 6, 1944, to July 6, 1944. The contract was cancellable at the option of the Company if the deliveries of wood should be inadequate, or at will upon ten days written notice. Other provisions are presently unimportant.

Hood testified for the respondent that he is a pulpwood dealer and claimant was at the time of the injury a sub-dealer or producer and the witness advanced him money to buy or cut pulpwood which he was to haul and load at the railroad, consigned in accord with the directions of the witness, some to Mead and some to Columbia Paper Company but of claimant's handling possibly 95 per cent. went to the Paper Company. During the year the witness had also sold some pulpwood to International Paper Company and Union Bag Company. Neither witness nor claimant was employed by the Paper Company. The witness has thirty or thirty-five such producers who pay their own helpers, with the hiring or firing of whom the witness has nothing to do; nor does he direct the loading of the trucks or control the work hours. The witness sometimes makes advances to his producers which he deducts on settlement, and sometimes the witness borrows from the Paper Company against these advances and at other times borrows from the Company on tracts of timber which he purchases. The following questions and answers are quoted from the examination and cross-examination of this witness, Hood:

"Q. How many producers have you? A. I don't know, a good crowd.

"Q. How many? A. I imagine around 30 or 35.

"Q. Some cut and haul? A. Where the producer has his truck.

"Q. Will he cut and haul? A. He does both.

"Q. He pays his own men? A. Yes, sir.

"Q. You have nothing to do with the hiring or firing? A. No, sir.

"Q. The producer loads the wood when he wants to? A. Yes, sir.

"Q. You try to get him to get out as much as he can? A. Yes, sir, his amounts are his own.

"Q. Do you, or not, direct the loading of the trucks? A. No, sir.

"Q. Who directs that? A. The producer.

"Q. Do you, or not, tell him when he has to leave the woods? A. No, sir.

"Q. Who does tell him when he is to leave the woods? A. If he don't leave there he will stay there.

"Q. Who employs men under him? A. The producer.

"Q. You have nothing to do with that? A. No, sir.

"Q. All you are concerned with is that the wood is shipped? A. Yes, sir.

\* \* \* \* \*

"The Court: Do you know from whom you bought this timber you were hauling that day? A. I could not think of the Negro's name.

"Q. You paid the Negro for the logs he was hauling? A. Yes, sir.

"Q. Have you been reimbursed by the Pulp Company? A. At that time I put all the money I had in the wood and asked them for advance every week.

"Q. They reimbursed before the wood was hauled? A. Yes, sir.

"Q. Any mortgage in connection with that purchase of that wood already cut? A. No, sir.

"Mr. Waring: It was your wood? A. Yes, sir.

"The Court: You didn't expect to make any money on it? A. Just my commission.

"Q. The hauling man was going to get the difference? A. Yes, sir.

The evidence has been set forth in perhaps too great detail but it was intended that no important part of it should be overlooked. Consideration of the whole is convincing

that an employer-employee relationship between appellant and respondent is not shown. Indeed, the opposite conclusion is inescapable. Hood, the dealer, stands between the parties-litigant. His status need not be determined except that he is not a sub-contractor within the terms of the act (Code, Sec. 7035-22(a) which is patent, and the contrary is not contended by appellant. The principal earmarks of employment in this sense are a contract, express or implied, compensation and control by the alleged employer, none of which is proven by the evidence presented. There was no appointment of appellant by respondent or contract of hire between them, express or implied, oral or written, which are the words of the statute (Code Sec. 7035-2 (b)). Rather, appellant was following an independent calling or occupation, a so-called producer on his own account, with his own employees, and was paid for his service by Hood.

Cases of some similarity from this court which were referred to in argument are: *Kennerly v. Ocmulgee Lumber Co.*, 206 S. C. 481, 34 S. E. (2d) 792; *Hopkins v. Darlington Veneer Co.*, 208 S. C. 307, 38 S. E. (2d) 4; and *McDowell v. Stilley Plywood Co.*, supra, 210 S. C. 173, 41 S. E. (2d) 872. The first of these, Kennerly, involved the voluntary subjection of an exempt industry (a sawmill) to the terms of the compensation law. Code, Secs. 7035-16 (b), 7035-5(2). The effort was to voluntarily come within the law only as to the employees of the sawmill and other specified activities, and not the incidental logging. It was held that the election to come under the law as to a part of the operations of the employer nevertheless included the logging operation because it was part and parcel of the business. The employer contracted with another to do its logging which brought it squarely under Section 7035-22(a) of the Code whereunder the logger was a "sub-contractor" and his employees were within the act just as if they had been employees of the main employer.

In the *Hopkins case* the main employer was not exempted from the terms of the compensation act and the injured employee of a sub-contractor for logging was held to be covered by the act as in the *Kennerly case*. There was no room for contention *contra* for the circumstances of the cases were nearly identical. Finally, it was decided in the *McDowell case* that the injured workman was not covered by the law because he was in fact a logging sub-contractor whose employees are included under the terms of Code, Sec. 7035-22 (a), but not the sub-contractor himself; he is treated in the act as an employer, and such is the law generally. 71 C. J. 486.

In all of the three cases just cited the timber being cut and transported to the employers' manufacturing plants was the property of the employers, which is in significant contrast with the facts of this case. Here there was no ownership by the defendant of the timber or the harvested pulpwood prior to the delivery of the latter to the railroad company for transportation to the defendant.

Other interesting logging and timber cases are digested in 4 Schneider's Workmen's Compensation Text, Perm. Ed., 95 *et seq.,* Sec. 1109; Ann. Cas. 1918-C, 656; and in various sub-divisions of the very exhaustive annotation in 19 A. L. R. 1168 *et seq.* The distinguishing differences between an independent contractor and the principal-agent relation were discussed in *Chatman v. Johnny J. Jones Exposition, Inc.,* S. C., 47 S. E. (2d) 302. The Comment Note in 75 A. L. R. 725 *et seq.* contains a listing of the criteria of the status of independent contractor which have been used by the courts in frequent encounters with the problem. An enlightening history of the doctrine appears in the dissenting opinion in *Stover Bedding Co. v. Industrial Commission,* 99 Utah 423, 107 P. (2d) 1027, 134 A. L. R. 1006.

In the case of *Perkinson v. Thomas,* 158 Va. 699, 164 S. E. 561, the plaintiff in error operated a lumber mill and

agreed to purchase from one Lucye logs delivered at the mill. Lucye bought standing timber on the land of another and proceeded to cut and deliver the logs. Among his employees was the defendant in error, Thomas, who was injured while loading logs on the skidway at Perkinson's mill. He was awarded compensation by the Industrial Commission upon the finding that he was an employee of a sub-contractor of Perkinson under the terms of the section of the Virginia Compensation Act which corresponds with Code, Sec. 7035-22(a) of our Act. The court reversed the award upon the ground that Lucye's activity constituted an independent business, subject to Perkinson only as to results; he was not a sub-contractor but an independent contractor, and the relation between Perkinson and Lucye was that of buyer and seller of a commodity.

Recently the Georgia Court of Appeals in *Huiet, Commissioner, v. Brunswick Pulp & Paper Co.,* 74 Ga. App. 355, 39 S. E. (2d) 545, 548, had under consideration an effort to levy taxes (for the purpose of Unemployment Compensation) on the wages of pulpwood gatherers upon the contention that they were employees of the Paper Company. The individuals whose work or earnings were the subject matter of the controversy were employees of a class of contractors variously known as pulpwood operators, producers or suppliers. These contractors purchased from Timber Lands, Incorporated, a wholly owned subsidiary of the defendant, organized by it as a land holding company and as the wood buying agency for the pulp mill of the defendant near Brunswick, Georgia, the right to cut and remove pulpwood from lands either owned outright or held under lease by it. The right to cut and remove pulpwood was sold to the contractors on a stumpage basis at a certain amount per unit, and the contractors then sold to the defendant the product or pulpwood sticks harvested on the lands at an agreed price per unit. The work performed by the employees involved consisted generally in felling and limbing the trees

utilized for pulpwood purposes, and sawing them into blocks or sticks of a uniform length, and piling or stacking the wood, and hauling it either to the mill of the defendant or to a point of delivery, and loading it on railroad cars. The factual conclusion of the lower court was affirmed, that the persons alluded to were not employees of the Paper Company, and the appellate court said: "The mere fact that a commodity is essential and necessary in the operation of a business does not mean that the supplying of it is a part of the business. It may be admitted that pulpwood is a commodity essential to the operation of the defendant's business, but it does not necessarily follow that the work of supplying the mill with pulpwood is a part of the usual business operated by the defendant."

That the fact that respondent here sometimes assisted Hood in financing his purchases, and the latter in turn made advances to claimant against his deliveries of pulpwood, presents no difficulty in the decision of this case is demonstrated by *Employers Mut. Liability Ins. Co. v. Industrial Commission,* 1937, 224 Wis. 527, 272 N. W. 481, where a lumber company which did not do its own logging was held not liable for the compensation of an injured employee of a farmer from whom the lumber company bought logs, where it appeared that the lumber company had loaned the farmer money with which he purchased certain timber land and equipment and that as he delivered the logs to the company his debts were charged off and that for reasons of convenience the lumber company, on orders from the farmer, issued checks to the farmer's employees in payment of their wages, charging the same to him, but there was no evidence that the lumber company had entered into a contract with the farmer for his services in promotion of its ordinary and usual business such as would otherwise be performed directly through its employees or that there was any connection between them which could be claimed to make them interdependent or to sustain a finding that the operator of one was

a contractor under the operator of the other or that there was any respect in which the farmer's physical conduct in the operation of his business could be controlled by the lumber company, but the two operations or businesses were separate and distinct. 150 A. L. R. 1254.

The respondent's method of obtaining its raw materials as disclosed by the facts before us may well be motivated by its desire to be free of the burden of the compensation law so far as the wood cutters and haulers are concerned, but this cannot affect its liability under the law. 71 C. J. 445; 446; *McDowell v. Stilley Plywood Co., supra,* 210 S. C. 173, 41 S. E. (2d) 872. It is the conditions of employment of the injured claimant which control. Here the controlling fact is that claimant was not an employee of the respondent, hence the trial court rightly concluded that the award of the Industrial Commission should be reversed. The conclusion is reached in full cognizance of the oft-repeated rule that the purpose of the compensation act is the inclusion of employers and employees and not their exclusion, wherefore doubts will be resolved to that end. *Yeomans v. Anheuser-Busch, Inc.,* 198 S. C. 65, 15 S. E. (2d) 833, 136 A. L. R. 894. But here we think there is no doubt.

Judgment affirmed.

BAKER, C.J., and FISHBURNE, TAYLOR and OXNER, JJ., concur.