17887

Dan PYETT, Administrator of the Estate of Daniel Pyett, Appellant, v. MARSH PLYWOOD CORPORATION and Liberty Mutual Insurance Company, Respondents.

(124 S. E. (2d) 617)

*Rogers W. Kirven, Esq.,* of Florence, *for Appellant,* cites:

*Messrs. R. A. Palmer, Weston Houck* and *Willcox, Hardee, Houck & Palmer,* of Florence, *for Respondents,*

March 14, 1962.

BUSSEY, Justice.

This is an appeal from the order of the circuit court affirming an opinion and award of the South Carolina Industrial Commission denying a claim for compensation and dismissing the same for lack of jurisdiction.

Although the exceptions are several, as we view the matter the only real question before this court is as follows: Was the appellant's intestate, Daniel Pyett, an employee of Marsh Plywood Corporation within the contemplation of

the South Carolina Compensation Act at the time of his death?

It is not contended that the deceased was directly employed by Marsh Plywood Corporation, but it is contended that he was an employee covered under the Workmen's Compensation Act by virtue of Section 72-111 of the 1952 Code of Laws, which reads as follows:

"When any person, in this section and §§ 72-113 and 72-114 referred to as 'owner', undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 72-113 to 72.116 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him."

The deceased came to his death in the course of his employment by J. W. Keefe who, at the time, was engaged in logging and not within the scope of the Workmen's Compensation Act, the place of his death being on a farm owned by one Robert Cox.

Marsh Plywood Corporation (hereinafter referred to simply as Marsh) is engaged in the business of manufacturing products from timber and, of course, requires a sufficient supply of raw materials for its operation. It acquires its raw materials both by the purchase of standing timber and by purchase from sundry individuals of timber already cut upon its delivery to its plant.

J. W. Keefe was engaged in farming and logging operations. He was not regularly employed by Marsh and was not at all times engaged in logging, but the record reflects considerable prior dealings between J. W. Keefe and Marsh over a period of several years. From time to time, Marsh advanced or loaned money to Keefe, and he was apparently

indebted in some amount to Marsh at the time of the transaction here involved.

Keefe owned all of his equipment; hired, fired and supervised his own employees. He supplied timber to Marsh from time to time under two different arrangements. Sometimes he cut it off of land controlled by Marsh and was paid under an agreed contract price per thousand feet for what he cut. At other times he cut timber off the lands of various individuals, whom he personally contacted and contracted with, and arranged for the sale of the cut timber to various concerns, including Marsh.

Keefe was engaged in the last mentioned type of operation on land belonging to Robert Cox at the time of the fatal accident. Prior to contacting Cox, Keefe obtained a price list from Marsh indicating what it was currently paying for certain types of timber desired by it. He also obtained a similar price list from other lumber concerns with whom he did business from time to time, but showed only the prices of Marsh to Cox as Marsh was paying the highest prices at that particular time. An arrangement was worked out between Cox and Keefe whereby Keefe agreed to cut Cox's timber for thirty dollars per thousand feet, with the difference between the logging price and the sales price of the timber, cut and delivered, to go to Robert Cox. There was no contract or agreement between Cox and Marsh and there is no probative evidence of any agreement on the part of Marsh to purchase from Keefe or anyone else all or any particular part of the timber to be cut from the Cox farm. The evidence is that Keefe had complete control over his employees, including the deceased, and that no one connected with Marsh had any voice in whom he hired or the manner in which he worked them. No one connected with Marsh told Keefe or his employees what timber to cut on the Cox farm or exercised any control whatsoever over the cutting of the timber, other than to indicate to Keefe or his employees from time to time the length of the logs which Marsh was in need of and was purchasing.

The timber was sold by the load after it was cut and delivered, and Marsh was free to stop buying at any time, Keefe being under no obligation to Marsh to continue deliveries. As the timber was delivered to Marsh, log tallies were issued in connection with each truckload, showing timber delivered by Keefe from the Cox farm, and at the end of each week, a log settlement statement and two checks were issued by Marsh and delivered to Keefe, one being payable to Keefe covering his contract price with Cox for logging, and the other payable to Cox. The checks payable to Cox were received by Keefe and delivered to Cox by Keefe. This method of payment was at the request of Keefe for his convenience in keeping the records straight between him and Cox.

Both the log tallies and the weekly settlement statements show delivered timber as being received from Keefe but that the stumpage was that of Cox. The weekly statements in evidence were receipted only by Keefe and showed that from the net amounts due Keefe weekly Marsh was deducting the sum of $2.50 per M on blocks and $5.00 per M on saw logs delivered during the week, such deductions being labeled "less on account" or "less on his account". The exact nature of Keefe's account with or his indebtedness to Marsh does not appear in the record.

At one time during the Cox operation, Marsh notified Keefe that they would buy no more timber for a time as a result of which Keefe made arrangements, with the approval of Cox, to sell the balance of the Cox timber elsewhere at a lower price. However, before actual delivery was made to anyone else, Marsh again started buying and Keefe ended up selling all of the timber from the Cox farm to Marsh.

There is no substantial conflict in the testimony of any of the witnesses who testified before the hearing Commissioner and the foregoing statement of facts is fully supported by the testimony of the various witnesses.

In determining whether or not the South Carolina Industrial Commission had jurisdiction of the claim presented, this court is not bound by a finding of fact by the Commission and has a wide latitude of review. *Knight v. Shepherd,* 191 S. C. 452, 4 S. E. (2d) 906. . Here, however, our latitude of review is unimportant in view of the fact that there is no substantial conflict in the evidence and the question of whether the deceased was a statutory employee of Marsh is, therefore, principally a question of law.

We are, of course, mindful that the basic purpose of the Workmen's Compensation Act is the inclusion of employees and not their exclusion. *Yeomans v. Anheuser-Busch, Inc.,* 198 S. C. 65, 15 S. E. (2d) 833, 136 A. L. R. 894; *Hopkins v. Darlington Verneer Co.,* 208 S. C. 307, 38 S. E. (2d) 4. Nevertheless, a construction should not be adopted that does violence to the specific provisions of the Act.

There is no South Carolina case dealing with the identical factual situation which we have here. There are three cases in which this court has either held or recognized an employee of a logger to be a statutory employee of a timber manufacturing plant, they being *Hopkins v. Darlington Veneer Co., supra; McDowell v. Stilley Plywood Co.,* 210 S. C. 173, 41 S. E. (2d) 872; and *Kennerly v. Ocmulgee Lumber Co.,* 206 S. C. 481, 34 S. E. (2d) 792, all of which are distinguishable from the instant case. In the last case cited, one Helmley was under contract to cut and haul to its mill timber from a large tract of land owned by Ocmulgee Lumber Company. Helmley owned his own equipment, hired and paid his own employees, and supervised and conducted the logging operations. The timber, however, was cut under the general supervision of a representative of Ocmulgee Lumber Company, who from time to time visited the premises and inspected the work. While this work was going on, one William Kennerly, Jr., an employee of Helmley,

was killed while logging timber for Helmley from the tract of land owned by Ocmulgee Lumber Company. The court held that Kennerly was a statutory employee of Ocmulgee Lumber Company, but in doing so, by way of *dictum*, made the following statement:

"Of course if Helmley had been an independent logging operator, and was merely selling logs to Ocmulgee Lumber Company, his employees could not claim under Workmen's Compensation Act as against this Lumber Company."

While the facts are somewhat different and the issue for determination was not precisely the same, the case of *Miles v. W. Va. Pulp & Paper Co.,* 212 S. C. 424, 48 S. E. (2d) 26, is more nearly in point with the facts of the instant case than any other case decided by this court. In that case, one Hood, referred to as a dealer, was supplying pulpwood to West Virginia. The claimant Miles was one of the loggers that Hood contracted with to cut some timber Hood had purchased and Miles was operating two trucks owned by the paper company and leased by it through Hood to Miles. The paper company provided Hood with a bookkeeper, loaned him money frequently, and provided several logging trucks for him to lease out to individual loggers. The paper company also provided gasoline ration stamps for the trucks leased out.

The foregoing is only a brief résumé of the factual situation in that case, but with respect to all of the evidence in the case this court said:

"Consideration of the whole is convincing that an employer-employee relationship between appellant (claimant) and respondent (Paper Company) is not shown. Indeed, the opposite conclusion is inescapable. Hood, the dealer, stands between the parties-litigant. *His status need not be determined except that he is not a sub-contractor within the terms of the act (Section 72-111, Code of Laws of 1952) which is patent, and the contrary is not contended by the appellant (claimant).* The principal earmarks of employ-

ment in this sense are a contract, expressed or implied, compensation and control by the alleged employer, none of which is proved by the evidence present." (Emphasis added.)

In that case, this court, with respect to the *Kennerly, Hopkins* and *McDowell cases, supra,* had the following to say:

"In all of the three cases just cited the timber being cut and transported to the employer's manufacturing plants was the property of the employer's, which is in signficant contrast with the facts of this case. Here there was no ownership by the defendant of the timber or the harvested pulpwood prior to the delivery of the latter to the railroad company for transportation to the defendant."

While this court has not had before it the identical factual situation here involved, it did in the *Miles case* cite, with approval by way of persuasive authority, a Virginia case in which the facts are practically identical. The language of this court is as follows:

"In the case of *Perkinson v. Thomas,* 158 Va. 699, 164 S. E. 561, the plaintiff in error operated a lumber mill and agreed to purchase from one Lucye logs delivered at the mill. Lucye bought standing timber on the land of another and proceeded to cut and deliver the logs. Among his employees was the defendant in error, Thomas, who was injured while loading logs on the skidway at Perkinson's mill. He was awarded compensation by the Industrial Commission upon the finding that he was an employee of a subcontractor of Perkinson under the terms of the section of the Virginia Compensation Act which corresponds with Code, Sec. 7035-22(a) of our Act. The court reversed the award upon the ground that Lucye's activity constituted an independent business, subject to Perkinson only as to results; he was not a sub-contractor but an independent contractor, and the relation between Perkinson and Lucye was that of buyer and seller of a commodity."

Here it seems to us that, just as in the cited Virginia case, Keefe's activity constituted an independent business subject to no control by Marsh Plywood Corporation except to keep Keefe and his employees informed as to the length of logs or blocks being purchased; Keefe was not a sub-contractor but an independent contractor and the relation between Marsh and Keefe was that of buyer and seller of a commodity.

As in the *Miles case,* consideration of the entire record before us is convincing that an employer-employee relationship between Daniel Pyett and Marsh is not shown. Keefe stood between the parties litigant and it is patent to us that he was not a subcontractor within the terms of the Act (Section 72-111 of the Code of Laws of 1952). There is nothing in the record to show that Daniel Pyett was otherwise an employee of Marsh.

It is, therefore, our conclusion that the judgment of the circuit court should be affirmed.

TAYLOR, C. J., Moss and LEWIS, JJ., and LEGGE, Acting Associate Justice, concur.