John G. MacMULLEN, Appellee,

v.

SOUTH CAROLINA ELECTRIC & GAS
COMPANY, Appellant.

No. 8578.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 25, 1962.

Decided Jan. 7, 1963.

Frank B. Gary and Harold W. Jacobs, Columbia, S. C. (Arthur M. Williams, Jr., Cooper & Gary, and Gene V. Pruet, Columbia, S. C., on the brief) for appellant.

Benny R. Greer and James P. Mozingo, III, Darlington, S. C. (Greer & Chandler, Darlington, S. C., on the brief) for appellee.

Before BOREMAN and BRYAN, Circuit Judges, and JOHN PAUL, District Judge.

BOREMAN, Circuit Judge.

John G. MacMullen, the plaintiff below, brought this action against South Carolina Electric & Gas Company to recover for personal injuries sustained by Mac-Mullen, alleged to have been caused by defendant's negligence while he was working on electrical equipment designed to control automatic coal-loading apparatus being installed as a part of defendant's newly constructed steam power generating plant at McMeekin Station, Irmo, South Carolina. Defendant interposed the defenses necessary to raise the questions presented at the trial. The case was tried before the District Court without a jury and MacMullen was awarded $75,000 in damages. The court found that the work in which plaintiff was engaged was not a part of the trade, business or occupation of the defendant; that MacMullen was no more than a "casual employee" of defendant and was

not limited to recovery under the provisions of the South Carolina Workmen's Compensation Law; that the defendant was negligent in allowing the equipment to become electrically energized while MacMullen was working on it; that MacMullen was not contributorily negligent and did not assume the risk and hazard of the work involved. On this appeal defendant challenges each of the court's findings and conclusions. We are of the opinion that the case is controlled by the South Carolina Workmen's Compensation Law which provides an exclusive remedy for MacMullen.

The first issue to be determined is whether the plaintiff was a "statutory employee" of defendant under the South Carolina Workmen's Compensation law[1] (hereinafter referred to as the Act or Compensation Act) and thus precluded from maintaining this common law negligence action. That Act provides (1) that when an "owner" undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with another to perform some part or all of the work, the owner shall be liable to pay any workman employed in the work any compensation under this Act which he would have been liable to pay if the workman had been immediately employed by the owner (Section 72–111); (2) that the owner has the same liability to the employees of a subcontractor of the contractor (Section 72–113); and (3) that the statutory employee to whom the owner is liable under the Act cannot be a mere "casual employee" (Sections 72–11 and 72–107).

MacMullen was not regularly employed directly by the electric company. In determining whether he was a "statutory employee," pertinent are the following questions: Was MacMullen employed by a subcontractor of a contractor with defendant? Was he performing work which was "in the trade, business, or occupation" of defendant? Was he a mere "casual employee" of defendant under the Act?

The District Judge's findings of fact and conclusions are found as reported in MacMullen v. South Carolina Electric & Gas Co., 205 F.Supp. 811. We do not disagree with the learned trial judge in his somewhat abbreviated statement of the historical facts. However, we believe that some amplification of those facts will be helpful in considering the issues and applying the South Carolina law. To that end we have examined the record and find uncontroverted evidence which shows the facts which are hereinafter stated in more detail. Many of these facts were developed in response to questions propounded directly to the witnesses by the trial judge.

The defendant is in the business of producing, distributing and selling electric power in South Carolina. Since the time of incorporation in 1924, although there was a change in corporate name in 1937 and the defendant merged with another corporation in 1943, the defendant's corporate charter has authorized and empowered it to *construct*, use and operate plants, systems, or parts thereof, for the production, use, distribution and sale of electricity. Some of defendant's employees have been engaged more or less continuously since 1949 in construction of new power generating facilities which were later put into service as part of defendant's power producing and distributing system or that of a subsidiary corporation. Plants constructed or acquired and completed by the defendant for its own use were Plant Hagood at Charleston, South Carolina, completed in 1952; McMeekin Station near Irmo, South Carolina, completed in 1959; Canadys' Station at Canadys, South Carolina, commenced in 1959 and still under construction at the time of the trial below. In addition, defendant's personnel were similarly active in the construction of Urquhart Station at Beech Island, South Carolina, completed about 1956 for South Carolina Generating Company, defendant's subsidiary.

1. Code of Laws of South Carolina (1952) §§ 72–1 through 72–504.

MacMullen's injury occurred on June 13, 1958, and during the last phase of construction of McMeekin Station. It is clear that there was no general contract let by the defendant for the construction of the McMeekin Station and the other new plants mentioned. There was an apparent, though unsuccessful, effort on plaintiff's behalf to show that Gilbert Associates, Inc., of Reading, Pennsylvania, was a prime contractor for such construction, but an examination of the record reveals that the true relationship between the defendant and Gilbert Associates arose following a written proposal submitted by the latter in 1950. Although the defendant did not sign and return the proposal as provided by its terms, oral acceptance by the defendant and repeated demands for services resulted in an effective working relationship under an engineering service contract. A division of functions between defendant and Gilbert Associates was carried out in practice over the period of eight to ten years during the building of the Urquhart, McMeekin and Canadys installations, and Gilbert Associates was employed to do engineering design work and to co-ordinate activities of defendant's personnel and various contractors at the job sites. A letter of July 15, 1955, from defendant authorized Gilbert Associates to proceed with engineering on the McMeekin Station.

It was shown by the evidence that defendant's functions at McMeekin Station were to own and manage the property on which the facility was being constructed, to outline its general requirements, to prepare specific designs for certain parts of the facility, to approve engineering plans and specifications, to provide supervisory personnel (such as an electrical supervisor, a field assistant, a general foreman and warehousemen) reporting to the general construction superintendent, to supply work crews consisting wholly of defendant's own employees, including both laborers and skilled craftsmen, for carrying out various parts of the project not contracted to outsiders, and to provide general assistance in contacting subcontractors and in co-ordinating their activities. Defendant's own employees were used extensively in constructing foundations, providing services such as furnishing compressed air at the work site, warehousing and handling of construction materials and erecting specialized machinery (for example, steam turbines and condensers) under supervision of manufacturers' representatives. On the other hand, Gilbert Associates prepared most of the detailed drawings and specifications for McMeekin Station, submitted them to defendant's chief engineer for approval, worked closely with defendant in all phases of designing, signed contracts with the various contractors "as agents for" defendant and provided a general superintendent with an assistant to generally co-ordinate the construction of the plant on the job site. Positions of foremen, general construction workers and skilled workers were never filled by Gilbert Associates' personnel and defendant had up to two hundred men employed in these activities. Mr. Crews, the general superintendent supplied by Gilbert Associates at McMeekin Station, described his job as "consulting" and "co-ordinating" at the job site.

On November 27, 1956, Fairfield Engineering Company, of Marion, Ohio, obtained a contract to furnish and install the continuous automatic coal-handling system for defendant at McMeekin Station. The contract was signed on defendant's behalf by Gilbert Associates "as agents for" defendant. In May 1957 Trans-Weigh Company, Wayne, Pennsylvania, subcontracted with Fairfield to provide, for less than $3,000, the design of a weighing and control system for the coal-handling apparatus and most of the components of this system, including a Leeds & Northrup electronic controller; to approve and warrant the compatibility of a Jeffrey Manufacturing Company feeder with motor driven rheostats being supplied directly to the job site by Fairfield; to furnish the services of its field engineer at $50 per day to install, adjust and calibrate the weighing equipment.

and to instruct defendant's personnel in the operation and use of the equipment.

MacMullen, a full-time employee of Trans-Weigh with considerable experience as a field engineer for that company, was assigned to the McMeekin Station job pursuant to Trans-Weigh's subcontract with Fairfield. He flew from Philadelphia, Pennsylvania, on June 10, 1958, and reported at McMeekin Station the following day. After working for two days, while checking out the weighing equipment on the morning of June 13, 1958, assisted by one of defendant's employees, MacMullen discovered that a part of the apparatus, supplied by Jeffrey Manufacturing Company and installed by Fairfield, was not functioning properly as a part of the automatic weighing and control system. He undertook to replace a small item of electrical apparatus in the Jeffrey equipment, obtained a substitute for the apparatus and had mounting brackets installed by defendant's mechanic. While attempting to complete alignment of the new equipment, he received a severe electric shock which caused his injuries. On the same day, after treatment, MacMullen returned to Philadelphia.

*Was construction of McMeekin Station part of the trade, business or occupation of defendant?*

The courts of South Carolina have been called upon to interpret that state's Compensation Act. In the leading case of Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825 (1939), the power company was in the business of generating and distributing electricity which from time to time required the erection of poles and transmission lines. In furtherance of its business purposes it contracted with an outsider to paint 170 metal poles. One of the contractor's workmen was injured while doing the work and sued the power company in a common law negligence action. It was held that the suit could not be maintained because the workman was injured while engaged in work which was "a part of the trade, business or occupation" of the defendant power company, and that the

worker's only remedy was under the Workmen's Compensation Statute which relieved the power company of common law liability. The court also recognized the difficulty of laying down general rules for determining whether the work in a given case falls within the designation of the Act saying, 190 S.C. at 361, 2 S.E.2d at 835,

"'* * * It is in each case largely a question of degree and of fact, * * *.'"

The Marchbanks decision was amplified in Boseman v. Pacific Mills, 193 S.C. 479, 8 S.E.2d 878 (1940), where, in execution of a contract between the owner of a cloth manufacturing mill and an independent contractor for the painting of a tank maintained by the mill for fire protection, an employee of the independent contractor was killed by an unexplained explosion of the tank. A claim against the mill for workmen's compensation was resisted on the ground that the workman was not an employee of the mill and that the painting of the tank was not part of its trade or business because the work was of such dangerous and unusual character that it was never done by the regular employees of the mill and was always let by contract to an experienced steeplejack. But the court held the mill liable under the Workmen's Compensation Act because the tank was an integral part of the mill business providing fire protection particularly necessary and essential in the cloth manufacturing business, and, therefore the painting of the tank was a part of the trade, business or occupation of the mill.

In the more recent case of Bell v. South Carolina Electric & Gas Co., 234 S.C. 577, 109 S.E.2d 441 (1959), the court sustained the power company's demurrer to the plaintiff's negligence complaint and held as a matter of law that the power company was the deceased workman's statutory employer. Plaintiff's intestate was killed while employed by a contractor who was transferring lines of the power company from one set of poles to another. The court said, 234 S.C. at 580, 109 S.E. 2d at 442: "The defendant Power Company is a public utility engaged in the

manufacture and transmission of electricity and uses poles and wires in its business and the repair and maintenance of such poles and wires or the transferring of such from one set of poles to another are part of its business, trade and occupation."

Other South Carolina cases which have held the employee of a contractor or subcontractor to be a "statutory employee" engaged "in the trade, business, or occupation" of the owner include Kennerly v. Ocmulgee Lumber Co., 206 S.C. 481, 34 S.E.2d 792 (1945), (employee of logging contractor for a sawmill company injured on company's timberlands while the contractor was cutting logs under general supervision of the company, the employee working under contractor's directions); Hopkins v. Darlington Veneer Co., 208 S.C. 307, 38 S.E.2d 4 (1946), (employee of logging contractor for a veneer company injured while cutting company-owned logs under supervision of contractor); Adams v. Davison-Paxon Co., 230 S.C. 532, 96 S.E.2d 566 (1957), (employee of contractor operating millinery department in owner's store injured on store stairway).

Another South Carolina case applying the same principles to hold the employee of a subcontractor to be a "statutory employee" of the general contractor because performing work directly related to that undertaken by the general contractor is Smith v. Fulmer, 198 S.C. 91, 15 S.E.2d 681 (1941), (employee of paving contractor killed in highway accident while procuring and transporting equipment to be used in paving work).

This court had occasion to examine and review the South Carolina law on this subject in its first consideration of Blue Ridge Rural Electric Cooperative v. Byrd, 238 F.2d 346 (4th Cir., 1956). The Byrd case was reversed by the Supreme Court of the United States and remanded for further proceedings on grounds which did not affect this court's construction of the Compensation Act, 356 U.S. 525, 78 S.Ct. 893, 21 L.Ed.2d 953 (1958), and it was further remanded by this court to the District Court (264 F.2d 689, 4th Cir., 1958) to allow the presentation of certain evidence to the jury in accordance with the Supreme Court's decision. In Byrd the Electric Cooperative was in the business of selling and distributing electric power to rural areas. Byrd's immediate employer contracted to construct new electric transmission and distribution lines, convert existing lines, and construct two appurtenant substations and a breaker station. Byrd was injured while working on power lines to one of the new substations. In holding this work to be within the trade, business, or occupation of Blue Ridge Cooperative, this court, speaking through Judge Soper, stated, 238 F.2d at 351:

> " * * * the statute recognizes the practice of letting out to others the actual performance of one's business and subjects the owner to liability for compensation to injured workers. The manifest purpose is to afford the benefits of compensation to the men who are exposed to the risks of its business, and to place the burden of paying compensation upon the organizer of the enterprise. In consequence, both the owner and the contractors whom he engages to do his work, are subjected to the requirements of the Act, and the workers receive double protection."

After analyzing the Marchbanks and Boseman decisions and citing other South Carolina cases, the court continued, 238 F.2d at 353:

> "The appellee seeks to distinguish some of these cases on the ground that in them the injured man was engaged in maintenance work ordinarily performed by the employees of the owner in the operation of the business; but it is manifest that it would defeat the purpose of the Act to make the prime mover of an enterprise liable to pay compensation for injuries suffered in the work of maintenance or repair, whether he is negligent or not, but to exempt him in the more important and more extensive field of new construction. For the same reason, it cannot be

held that an owner is not obliged to provide compensation for injuries incurred in the course of construction work performed on his behalf as part of his business, if he customarily lets the work out to independent contractors and does not perform it himself. It will have been noticed that § 72–111 of the Act expressly covers an owner who undertakes to perform any work which is part of his business and contracts with any other person for the execution 'of the whole or any part of the work.' Thus, the statute recognizes that work done at the behest of the owner is owner's work; and unless he is held liable to pay compensation for injuries incurred in its progress the underlying purpose of the Act will be frustrated.

\*   \*   \*   \*   \*   \*

"It cannot be denied that Blue Ridge was vitally concerned in the construction of the equipment covered by the Bouligny contract, without which the distribution of its product would have been impossible."

The District Court found and referred to certain facts, obviously accepting them as controlling, on the issue of whether the work being done by Fairfield and Trans-Weigh was a part of the "usual trade, business and occupation" of the defendant.[2]

■ Applying the Compensation Act as interpreted in the South Carolina cases and by this court, it is manifest that defendant was engaged "in the trade or business" of constructing new additions to its power-generating facilities in its construction of McMeekin Station and we are compelled to disagree with the contrary finding and conclusion of the District Court on this point. In the course of its business of producing, selling and distributing electricity, defendant had occasion to enlarge its power production facilities. It did so over a period of years and utilized its own personnel extensively in designing, supervising and in actual construction. At the McMeekin project, Fairfield was one of approximately twenty-five contractors from which defendant purchased materials and construction services. The coal-handling equipment to be furnished and installed by Fairfield was essential to supply the coal as fuel for production of steam and generation of electric power in defendant's plant. Those portions of the control system, instruments and services to be provided by Trans-Weigh were necessary to make automatic the opera-

2. In 205 F.Supp. 811, at 814, the District Court stated a combination of findings and conclusions as follows:

"The overall planning and construction of the steam generating plant at Irmo, South Carolina, was under the direction and supervision of Gilbert Associates, Inc. The entire operation of furnishing and installing the automatic coal handling system was contracted to the Fairfield Engineering Company who are specialists in this field. The defendant has never undertaken on its own the planning and construction of a steam generating plant. The defendant has never done its own installation of a coal handling system at any station. The defendant has never undertaken to manufacture, install and put into operation an automatic electronic coal weighing system. This is a very specialized field, and, according to the evidence, there are only three companies other than Trans-Weigh Company in the United States that supply, install and calibrate coal weighing equipment. I find from the evidence that the defendant had neither the facilities nor the personnel to plan and carry out the construction of a steam generating plant, and especially that the defendant had neither the facilities nor the personnel to construct, install and put into operation an automatic coal handling system, and that neither of these undertakings are part of the usual trade, business and occupation of the defendant. It is true that according to the charter under which the defendant operates it would have the power and authority to enter into the business of constructing electric generating plants and the various components thereof. However, the record shows that the defendant has not entered the business of constructing electric generating plants nor of installing automatic coal handling equipment, either independently or as a component part of other construction work."

tion of the coal-handling system as required by the specifications and contract. The basic purpose of the Compensation Act is the inclusion of employers and employees and not their exclusion.[3] This purpose would be defeated were we here to hold the Act applicable only to maintenance and repair and to exempt the employer in the more important field of new construction.[4]

### Was MacMullen a casual employee of defendant?

The District Court found, 205 F.Supp. 811, at 815:

"Plaintiff's employment status with the defendant at the time of his complained of injuries could have been no more than that of a 'casual employee.' He had never done like work for the defendant before and there is nothing in the evidence to indicate that either the plaintiff or the defendant contemplated that such a relation would continue in the future."

This finding was obviously the basis of the District Court's conclusion of law that MacMullen, as a "casual employee" of defendant, is not entitled to the benefits of the Compensation Act and the defendant is not entitled to its protection.

It is true, as noted by the District Court, that MacMullen testified it was not normal procedure for him to repair or replace equipment manufactured by companies other than Trans-Weigh and that, on the occasion of his injury, he did so only at the request of, and after certain assurances from, the defendant. Apparently the trial judge, relying upon this testimony, drew the inference that MacMullen, at the time he was injured, was working directly for the defendant on a casual basis and not in the course of his employment with Trans-Weigh. We again find ourselves in disagreement with the District Court.

Although our consideration of this question necessarily involves some repetition, we again turn to the evidence to explain the basis of our conclusion that the District Court was in error.

Trans-Weigh, Fairfield's subcontractor, proposed that it would furnish, at a stated price, equipment equivalent to that actually purchased by Fairfield from Jeffrey, or that Fairfield could purchase it directly from the manufacturer and supply the same as a part of the over-all control system and for Trans-Weigh's use in complying with the terms of its subcontract. Fairfield elected to and did purchase the equipment from Jeffrey but only upon receipt of Trans-Weigh's assurance and warranty of the equipment's compatibility with the other components of the control system, including the parts of the equipment to be furnished and installed by Trans-Weigh.

MacMullen acknowledged that he was quite familiar with the Jeffrey equipment since that equipment or its equivalent was included as a component part of most of the weighing and control systems installed or serviced by him. He agreed that the Jeffrey equipment had to work properly and compatibly with that furnished by Trans-Weigh for the coal-handling system to function as a unit in the automatic control of the flow of coal into the plant.

Complying with that portion of the Contract Purchase Order requiring it to furnish operating instructions for the control system, Trans-Weigh provided an Instruction Manual. This pamphlet specifically shows the control system as comprising not only the units furnished by Trans-Weigh but also the vibrating feeder and motor-driven rheostat unit purchased from Jeffrey by Fairfield. Furthermore, every section, such as "Description of Operation," "Preliminary Checks" and "Trouble-Shooting," deals in as much detail with the Jeffrey equipment as that furnished by Trans-Weigh.

By its invoice of December 27, 1957, Trans-Weigh billed Fairfield for the system. The equipment was assembled at

---

3. Hopkins v. Darlington Veneer Co., 208 S.C. 307, 38 S.E.2d 4 (1946).

4. Blue Ridge Rural Electric Cooperative v. Byrd, 238 F.2d 346 (4th Cir., 1956).

McMeekin Station and on June 10, 1958, Fairfield notified Trans-Weigh to send one of its engineers to install, check, calibrate and instruct in the operation and use of the system. On June 18, 1958, Trans-Weigh billed Fairfield for Mac-Mullen's services including the time spent by him in modifying the Jeffrey unit.

By the terms of the documents in evidence, including the subcontract of Trans-Weigh, it is obvious that Trans-Weigh was to design the control system for the coal-handling system and, coincidentally, was to furnish certain of the individual units comprising it. Other units, of which the Jeffrey equipment was one, were purchased and supplied by Fairfield.

The design and operation of the system were of prime importance, not the furnishing of several of its individual components. The fact that one party furnished a portion of the equipment and the other party the remainder was purely a matter of agreement and convenience between them and had nothing to do with Trans-Weigh's responsibility to see that each individual unit was properly designed to perform, and did perform, its function in the over-all system. Indeed, Trans-Weigh's own instruction manual specifically refers to the interdependence of the various units in the system. This interdependence and the impossibility of checking one without checking all are pointed up by the facts that, even after modification of the Jeffrey equipment, the control system still did not function properly until it was subsequently discovered that the amplifier, furnished by Trans-Weigh and claimed by MacMullen to have been checked and found to be in working order, was also defective and was repaired or replaced. Significant as revealing Trans-Weigh's conception of its obligation under its subcontract to assure the proper operation of the entire control system, and as to whether MacMullen was working as a regular employee of Trans-Weigh or was employed directly

by the defendant when he was injured, are the facts that Trans-Weigh paid Mac-Mullen, billed Fairfield and was paid by Fairfield for the time plaintiff spent in modifying the Jeffrey equipment.

Clearly, Fairfield was responsible to defendant for the complete coal-handling system. It is equally clear that Trans-Weigh was responsible to Fairfield for the compatible operation of all units of the system and not, as asserted by plaintiff and found by the District Court, only for the individual units furnished by it. MacMullen was sent to McMeekin Station to put this system in operational order and it was while doing so that he was injured. The installation of the coal-handling equipment and the work necessary to put it in operation [5] were foreseeable within the normal course of defendant's trade, business or occupation of constructing electric generating plants for the production of electricity for transmission and sale. MacMullen was employed in furtherance of Trans-Weigh's obligation under its contract with Fairfield and Fairfield's obligation under its contract with defendant to install, check, calibrate and instruct defendant's employees in the operation and use of the coal-handling system. MacMullen was, therefore, " * * * doing something for the subcontractor which bore some reasonably direct relation to the performance 'of the work undertaken' by the contractor" and comes within the coverage of the Compensation Act. Smith v. Fulmer, 198 S.C. 91, 96, 15 S.E.2d 681, 683 (1941). We cannot disregard the obvious fact that Trans-Weigh's interests and contractual obligations were directly advanced by MacMullen's services in attempting the modification and replacement of a part of the Jeffrey equipment to assure the functional operation of the control system. Even though MacMullen performed these services when, as the engineer and representative of Trans-Weigh on the job and in order to avoid unnecessary delay, he was requested by

5. By its subcontract Trans-Weigh was required by Fairfield to carry Workmen's Compensation, Public Liability and Property Damage Insurance and provide a certificate of such coverage.

defendant to speed to completion the automatic operation of the control system, it does not follow that he thereby became a "casual employee" of the defendant so as to be precluded from the benefits of the Compensation Act.[6]

■ In reaching our decision we are not unmindful of that portion of Rule 52 (a) of the Federal Rules of Civil Procedure which provides that findings of fact in actions tried before the court without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." But that rule, by interpretation, is subject to exception and modification. In United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Court held: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has

been committed." We are left with that definite and firm conviction.

However, our decision need not be bottomed solely upon this ground. Here the District Court premised its ultimate findings (that the construction of the McMeekin Station was not a part of the trade, business or occupation of the defendant, and that MacMullen was no more than a "casual employee" of defendant) on its interpretation of the standards to be applied. Because of the nature of the District Court's error, we are here reviewing primarily questions of law, namely, whether the District Court applied the proper standards to essentially undisputed facts. We are of the opinion that the ultimate findings and conclusions below, with which we disagree, were based on an erroneous interpretation and application of the law.[7]

It has been held in South Carolina that an employee's inclusion within the provisions of the Compensation Act of that state as a "statutory employee" not only

6. In stating its conclusion that MacMullen, *as* a "casual employee" of defendant, was not entitled to the benefits of the Compensation Act, the trial court cited only Jolly v. Atlantic Greyhound Corporation, 207 S.C. 1, 35 S.E.2d 42 (1945). That case would support the trial court's conclusion only if there had first been a correct determination that MacMullen was a casual employee of defendant. But the Jolly case is so clearly distinguishable on its facts from the case at bar as to render it inapposite in determining the nature of MacMullen's services and the employer-employee relationship existing at the time of his injury.

Jolly was regularly employed by the owner of a rural store and cafe, where lodging also was furnished for sportsmen. The gasoline filling station operated by the owner of the establishment was incidental to the other offered services. No garage or automobile repair services were provided—not even changing or repairing tires. When an Atlantic Greyhound bus, with motor inoperative, coasted to the gasoline pumps, Jolly undertook to pour gasoline from a can into the carburetor of the bus while the regular driver was attempting, from inside the bus, to start the motor. An explosion occurred and Jolly was injured. He con-

tended that he was a "statutory employee" of the bus company under the Compensation Act and thus entitled to the benefits of the Act. The court, merely assuming but not deciding that claimant Jolly became an employee of the defendant bus company, held that he was no more than a casual employee. There the bus company was not a customer of Jolly's regular employer, there was no relationship of any kind between them and the service which Jolly was attempting to render was totally unforeseeable. The relationship of Jolly to the bus company came within the definition of "casual" quoted by the court: " 'Happening or coming to pass without design, and without being foreseen or expected; coming by chance; coming without regularity; occasional; accidental [incidental].' " 207 S.C. at 14, 35 S.E.2d at 47. By contrast, in the instant case the contractual relationships between the companies involved were by design and careful planning, and the furnishing of MacMullen's services by Trans-Weigh was foreseeable and necessary to discharge the obligations of his employer.

7. See United States v. Parke, Davis & Co., 362 U.S. 29 (1960), particularly at pages 43–45, 80 S.Ct. 503, 511–512, 4 L. Ed.2d 505.

entitles him to the benefits of the Act but also renders the "owner" under the Act immune from action based on common law liability.[8]

We think MacMullen was not entitled to maintain this action. In view of our stated conclusions, it is unnecessary to consider the other findings below with respect to defendant's negligence, the absence of plaintiff's contributory negligence and assumption of risk.

Reversed and remanded with direction to dismiss.

8. See Adams v. Davison-Paxon Company, 230 S.C. 532, 96 S.E.2d 566 (1957); Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825 (1939).