Joseph D. McCASKEY, Plaintiff,

v.

DANIEL INTERNATIONAL CORPORA-
TION, d/b/a Daniel Construction
Co., Defendant,

v.

SOUTHERN ENGINEERING COMPA-
NY, Third-Party Defendant.

Civ. A. No. 77–206.

United States District Court,
D. South Carolina,
Greenville Division.

Oct. 19, 1977.

Frank H. Gibbes, III, Greenville, S. C., for plaintiff.

Tom H. Coker, Jr., James B. Pressly, Jr., and W. Francis Marion, Greenville, S. C., for Daniel International Corp., d/b/a Daniel Construction Co.

William N. Hagood, III, Greenville, S. C., for Third Party Defendant, Southern Engineering Co.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HEMPHILL, District Judge.

This tort action was instituted by the plaintiff, Joseph D. McCaskey, against the defendant, Daniel International Corporation, d/b/a Daniel Construction Company (hereinafter referred to as "Daniel") by service of Summons and Complaint, seeking recovery for certain injuries plaintiff allegedly sustained while working for International Steel Erectors at its job site at Fiber Industries, Inc., near Florence, South Carolina. Plaintiff alleges that these injuries resulted when he fell into an open ditch and that the accident resulted from the negligence of defendant Daniel. Defendant answers denying the substantive allegations of the Complaint, pleading contributory negligence on the part of plaintiff as a defense, and alleging that at the time of the accident plaintiff was a statutory employee of Daniel within the meaning of the South Carolina Workman's Compensation Act (sometimes hereinafter referred to as "the Act"). Subsequently, Daniel moved the court to allow it to serve a Third Party Complaint upon one of its subcontractors on the Fiber Industries job, Southern Engineering Corporation (hereinafter referred to as "Southern"); the motion was granted by the court. Daniel then served the Third Party Complaint alleging that the terms and conditions of the subcontract between Daniel and Southern provided that Southern would indemnify and save Daniel harmless from all losses arising from any injury to any person connected with the performance of the subcontract. The Third Party Defendant answered, denying that it was liable to Daniel for any damages which Daniel may sustain because of this case.

Since the institution of the suit, depositions of plaintiff, Joseph D. McCaskey and the Vice President and General Sales Manager of Southern Engineering Company, John T. Price, have been taken. Defendant

Daniel has served Requests for Admissions upon plaintiff and plaintiff has responded to those Requests. Both plaintiff and defendant have served upon each other and answered Interrogatories.

The matter is presently before the court upon defendant Daniel's Motion for Summary Judgment based upon the record now before the court.[1]

The facts giving rise to the instant suit are as follows. On November 11, 1974, Joseph D. McCaskey was a foreman for International Steel Erectors (hereinafter referred to as "International"), working at a construction site at Fiber Industries, Inc., near Florence, South Carolina. (McCaskey depo. p. 5; plaintiff's response to defendant's Request for Admission No. 5). On that date he fell into a ditch at the construction site and was injured. At the time of the injury he was engaged in erecting the steel structure for additions at that manufacturing facility. The activities in which he was engaged were a necessary part of his employment. (McCaskey depo. p. 6). McCaskey has accepted workman's compensation benefits for the injuries resulting from that fall. (Plaintiff's response to defendant's Request for Admission No. 6). On the job site that the plaintiff was injured, defendant, Daniel was retained by Fiber Industries to act as general contractor for the erection of the additions to the Fiber Industries plant. Plaintiff's employer was a subcontractor of Southern. The subcontract between Southern and International was entered on April 26, 1974. (Affidavit of Love). A written contract between Daniel and Southern was executed, at latest, on August 1, 1974. (See plaintiff's Response to defendant's Request for Admission No. 5; Price depo. p. 26).

The sole issue for determination here is whether or not Daniel was a statutory employer of plaintiff, for purposes of the South Carolina Workman's Compensation Act, on the date he was injured. If Daniel

1. Fed.R.Civ.P. 56(c) provides that the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

was, plaintiff is barred from the common law remedy he here seeks to assert against it. If Daniel was not, the present suit is properly maintainable and may continue to proceed. For reasons hereinafter set forth this court finds that Daniel was a statutory employer of plaintiff on the date of his injury and because of that relationship, plaintiff is barred from proceeding against it for further redress of his injuries.

The South Carolina Workman's Compensation Act provides that when an injured employee accepts the benefits of the provisions of that Act, his common law remedies against his employer are extinguished. South Carolina Code Annot., § 42–1–540 (1976).[2] The definition of employer within that section is not limited simply to the injured person's immediate employer; rather, the Act expands the definition to include all of those for whom the employee is working, either directly or indirectly. South Carolina Code Annot., § 42–1–140 and 420 (1976). See *Chavis v. E. I. DuPont de Nemours and Co.*, 283 F.2d 929 (4th Cir. 1960). The purpose of expanding the definition of employer within the context of the Workman's Compensation Act is to provide the employee with additional guarantees that he will not be remediless in the case of a work related injury. See *MacMullen v. South Carolina Electric and Gas*, 312 F.2d 662 (4th Cir. 1963). *Kennerly v. Ocmulgee Lumber Co.*, 206 S.C. 481, 34 S.E.2d 792 (1945).

*Chavis*, supra, stands for the proposition that a general contractor is a statutory employer of its subcontractor's employees, and, as such, if an employee is injured and receives Workman's Compensation benefits for such injury, he is barred from any

action, for the same injury, he might otherwise have against the general contractor. Plaintiff was an employee of International Steel Erectors, a subcontractor of Southern Engineering Company. If Southern was a subcontractor of Daniel, plaintiff would likewise be barred as against Daniel, even though his employer was a subcontractor of an outfit which was itself a subcontractor of Daniel for—"once the highest responsible person is determined by reference to [the statute] *every intermediate contractor under him* (court's emphasis) shoulders the same, indeed the primary, obligation, for the principal contractor is entitled to indemnity [by statute] from him and to call him in to defend the compensation claim," *Chavis* at page 932. Although not factually present in that case, the Fourth Circuit's language seems tacit recognition of the fact that an employee of a subcontractor's subcontractor can be an employee of and therefore have as a statutory employer the general contractor on the job. This is consistent with judicial interpretations of the Act. The test is not the degree of attenuation between the prime contractor and the employer (here International Steel Erectors) of the employee seeking recovery against the prime contractor, but whether or not that which was being done was a part of the general trade or business of the prime contractor.[3] Therefore, if Southern was a subcontractor of Daniel, doing "Daniel work", and International was doing "Southern work" (and thus "Daniel work") plaintiff is barred from seeking recovery against Daniel. This proposition is not disputed by plaintiff. However, he maintains that Southern was not a subcontractor of Daniel, and was not doing "Daniel work", and therefore is not barred from proceeding against Daniel.

---

2. This court is not unaware of the 1974 amendment to that section which reads as follows:

"Provided, however, this limitation of actions shall not apply to injuries resulting from acts of a subcontractor of the employer or his employees or bar actions by an employee of one subcontractor against another subcontractor or his employees when both subcontractors are hired by a common employer."

The amendment has not to this court's knowledge been interpreted by the State courts. It

would seem, however, to have no application to Daniel since Daniel is not a subcontractor, but a general contractor—for a subcontractor has been defined as one to whom principal contractor, for consideration, let the right to do a part of the work which the principal has contracted to do. *Miller v. Cornell-Young Co.*, 171 S.C. 228, 171 S.E. 790 (1933); See generally: *Words & Phrases.*

3. *Hopkins v. Darlington Veneer Co.*, 208 S.C. 307, 38 S.E.2d 4 (1946).

Plaintiff bases his contention on the following:

■ On March 1, 1973, Fiber Industries, Inc., and Daniel International Corporation entered into a contract for the construction of a synthetic fiber plant near Florence, South Carolina. According to the terms of this contract, Daniel's work was to include the furnishing of personnel, labor, materials, construction equipment, tools, supplies and services necessary to satisfactorily perform the construction work, *except such parts of said work as Fiber performed or had performed by others.* On January 28, 1974, Catalytic Construction Company, retained engineer for Fiber Industries, Inc., on behalf of Fiber Industries, solicited from Southern Engineering Company its bid on the structural steel work for Phase 2 of additions to the Fiber plant near Florence, South Carolina. (Price Dep. p. 8). At a meeting on February 12, 1974, attended by representatives of Southern, Catalytic, and Fiber, Southern learned that its bid for the steel work had been accepted by Fiber. On March 5, 1974, Southern entered into a contract with Fiber Industries for the erection of the structural steel at the Fiber plant near Florence. Subsequent to its contract with Fiber, Southern entered into a subcontract with International Steel on April 26, 1974, for the erection of the structural steel at the Fiber plant. (Price Dep. p. 19). As of April 26, 1974, Southern entered into this contract with International and plaintiff maintains that Southern had not entered into any contract with Daniel for this steel work at the Fiber project in Florence. In July, 1974, Southern started fabrication of the steel for the erection of the steel structure. (Price Dep. p. 30).

On or about August 1, 1974, Daniel and Southern officials executed a written document bearing a date of May 15, 1974, on its face relating to the fabrication and erection of the structural steel at the Fiber project. As such plaintiff contends that Daniel was not a statutory employer of the employees of International because the original solicitation of Southern Engineering was from Catalytic on behalf of Fiber Industries, that Fiber and Southern entered into a contract for Southern to perform the work, that while Southern's contract was with Fiber, the subcontract with International was entered and at that time the rights and status of the employees of International were unalterably established. (Plaintiff's response to defendant's Request for Admission No. 2). That is, Southern's contract with Fiber and Southern's contract with International was work, which was not contemplated to be performed by Daniel under its general contract with Fiber because it was work excepted under the general contract as ". . . work Fiber performed or had performed by others."

Although plaintiff's counsel is commended for zealous advocacy in behalf of his client's cause and his inventive argument, his reasoning fails. The record as well as the law clearly indicates that Southern was indeed a subcontractor of Daniel, and that as such plaintiff is barred from recovery against Daniel, supra.

First, the contract entered into between Southern and Daniel clearly provided for performance of the very thing which plaintiff alleges Southern contracted with Fiber to do.[4] Although Fiber, through its agent, may have effectuated the negotiations and procurement of Southern's service, the only conclusion that can be reached is that Southern's subcontract with Daniel shifted the obligation, responsibilities and supervisory control with respect to steel erection from Fiber to Daniel.[5] Regardless of

4. Page one of the subcontract under the heading "SCOPE" provided that Southern was to: "Furnish all labor, materials, equipment, tools, supervision, insurance, taxes, and service necessary to fabricate, deliver, unload, and erect the structural steel and joists as described below. The consideration to be paid by Daniel, set out on page two of the contract, was $966,614.86 (approx.).

5. This assumes that the parties did not envision Daniel's participation in the steel erection in the first instance. The record establishes, however, that such was envisioned by the parties in the first instance.

whether or not Southern could look to Fiber for payment for construction of the steel before entering the subcontract with Daniel, the subcontract by its terms, shifted responsibility for payment of the steel erection work to Daniel to the tune of almost one million dollars. And Daniel did in fact make the progress payments to Southern under the contract and Southern in turn to International under their contract. (Price Dep. p. 36).

Secondly, John T. Price's deposition clearly indicates that this relationship between Daniel and Southern was (at all times) that of general contractor and subcontractor:

Q. And, again, that bid was submitted to Fiber rather than to Daniel.

A. It was submitted to Catalytic with—I mean, yeah, the bid was submitted to Catalytic, which I knew it was for Fibers, and I also knew that it was the low bidder and the steel bidder knew, to start off with, that it would be turned over to Daniel Construction Company because Daniel was already on the job down there. They had been down there for quite some time. See, this was just Phase Two of the job. We did not do Phase One of the job.

Q. All right. So all of your dealings up until that point in time, at least, through the date that you submitted your bid to Catalytic, were in response to a solicitation by Catalytic on behalf of Fiber.

A. On behalf of Fibers, but I knew Daniel was going to do the work. I mean I knew they were the general contractor.

Q. You knew that they were the general contractor on the job.

A. Right. I knew our bid would end up in their hands. I mean, this is nothing unusual. (pp. 10–11).

Before entering the formal subcontract with Daniel, a purchase order issued by Fiber was signed not only by Southern but also by John Isbell, a purchasing agent for Daniel on behalf of Daniel. (p. 17).

At pages 20–21, the examination of Price continues:

Q. All right, sir. So even up this far, on April 26, 1974, there was no contract between Southern and Daniel, that you are aware of, in connection with the Fiber job in Darlington.

MR. JOHNSTON: Is that a written contract or oral?

Q. Well, I'll ask you first, any written contract?

A. No written.

Q. Was there any oral contract between Daniel and Southern, that you are aware of, in connection with the Darlington job?

A. Yes.

Q. All right, sir. And what was that?

A. That we would—our contract would be transferred over to Daniel, because it states right here on the International, it says the material is going to be shipped to Daniel Construction Company at the Fibers job. That's where they would receive it.

Q. It was your understanding then, as of April 26, 1974, that—well, tell me in your own words again. What was your understanding of Southern's relationship to Daniel, if any, at that time?

A. At what time, now? This date?

Q. As of April 26, 1974.

A. We knew that we would receive a purchase order or contract, however you want to call it, a purchase order from Daniel. And our contract, which is Exhibit A from Fiber Industries, would be turned over to Daniel Construction Company.

And with regard to the written subcontract entered into between Daniel and Southern, Mr. Price states at pp. 22–23:

Q. All right, sir. Now, would you tell us what this document is; what did it mean to you? What was the practical effect of this document as far as you were concerned?

Q. What you're saying, what's been identified as Exhibit Number One, the purchase order [contract] from Fiber to Southern, the work that is the subject of this purchase order is the same work that is the subject of Exhibit Three. [Southern's contract with Daniel].

A. That is correct.

With respect to on the job changes and problems, Price states at pages 27–29:

Q. And when you're talking about additions, you mean . . .

A. Adding materials.

Q. . . . added work, or added materials, added steel erection?

A. Yes. Any time steel was added, added erection was added, and it was put up by International . . . .

Q. Well, let me rephrase the question. When Fiber wanted to make additions beyond the work specified in the original agreement, Fiber would have to contact your company, either by phone, letter, a meeting, or however, to discuss the required addition and your handling of it; is that right?

A. No. Daniel generally contacted us.

Q. Daniel generally contacted you?

A. Once the contract was turned over to us, Daniel's contract was turned over to us, all our contracts from then on were with Daniel.

Q. You never had any further contacts with Fiber, after . . .

A. Except they would be in the meeting. If we met, they had a representative that stayed down there at the job. But our contact on any money, or anything that took place on this job was handled directly with Daniel.

Q. Did you receive your payments on the contract from Daniel?

A. That is correct.

Q. Well, I don't mean in your company. I mean when you had a problem that arose on the job, who did you meet with, Daniel or Fiber, to resolve the problem?

A. Daniel.

On cross-examination, Price at page 37 summarized:

Q. In other words, there was never any doubt that Daniel was to exercise supervision over the job that you did.

A. That's correct.

Q. And never any doubt that you would exercise supervision over the job that International did.

A. That's correct.

Q. And did your company, in fact, exercise supervision over International, and did Daniel, in fact, exercise supervisory control over you?

A. We had supervisory control over International as far as telling them what to put up, and we could stop them any time we wanted to, or start them any time we wanted to. Daniel had the same control over us.

Q. I would assume that International came on the jobsite when you all started bringing steel down for erection.

A. Yes, sir.

It is abundantly clear from Price's deposition, in conjunction with the rest of the record, that Daniel was responsible for the erection of the steel structure at the Fiber's plant, that Daniel subbed that work out to Southern, and that Southern in turn subbed out a portion to International. And although Southern may have begun fabrication of steel prior to entrance of a formal, written contract with Daniel, it never contemplated control over performance of the erection of the steel structure by anyone but Daniel. This is corroborated by the fact that actual erection at the site by Southern and International was not begun until October of 1974, after the formal contract between Southern and Daniel was entered into. (Price's Dep. pp. 26 and 37).

Finally, the case of *Conner v. Conway Glass and Paint Co.*, 244 S.C. 294, 136 S.E.2d 772 (1964) is as Daniel's able counsel urges helpful to the disposition of this matter. There, Johnny Conner, an employee of Conway Glass and Paint Co., was injured while on the job. He claimed Workman's Compensation for his injuries from Hardee Construction Co. pursuant to South Carolina Code Annot. § 72–112 (1962).[6] Hardee Construction Co. was the general contractor employed by the estate of H. W. Tallevast to repair and remodel a store building. A necessary part of that project was the removal of certain plate glass. The claimant

---

6. § 42–1–410 (1976).

was injured while he was removing a section of that plate glass. Both the general contractor and the president of the glass company denied that the glass company was acting as a subcontractor of the general contractor. Each testified that the glass company had been retained by the estate to perform the work, rather than by the general contractor. However, the Supreme Court upheld the Industrial Commission's finding that Conner was entitled to receive Workman's Compensation payment from Hardee, reasoning in light of testimony to the effect that the estate made the initial contact and inquiry as to Conway Glass's retention, and that Conway was paid by the estate for the services it rendered, that no satisfactory explanation as to how the services were arranged for was given, except for contacts between Hardee and Conway. The court noted at page 774:

> We think it more significant that the removal and replacement of the plate glass was part of the work which the construction company undertook to do for the Tallevast estate.

Although the *Conner* case did not arise on an appeal from summary judgment, thus making review of the trial court's decision less stringent than if it had arisen in that posture, it further corroborates the rationale that in the reality of the factual situation, one for whose purpose the claimant is in fact working and under whose control the claimant is in fact subjected, can be looked to by that claimant for Workman's Compensation benefits and conversely can take advantage of the immunity provision of the act. This is consistent with the South Carolina court's policy in construing the employer-employee relationship broadly in order to "include" rather than "exclude" the claimant's Workman's Compensation claim. *McDowell v. Stilley Plywood Co.*, 210 S.C. 173, 41 S.E.2d 872 (1947); *Pate v. Plymouth Mfg. Co.*, 198 S.C. 159, 17 S.E.2d 146 (1941).

For the above mentioned reasons, defendant Daniel's Motion for Summary Judgment is GRANTED.

AND IT IS SO ORDERED.